[No. 24747.   Department One.   January 2, 1934.]

Mary A. Bloss, *as Guardian of Roy S. Bloss, Respondent,* v. The Equitable Life Assurance Society of the United States, *Appellant.*[1]

[1]Repórted in 28 P. (2d) 303; 33 P. (2d) 375.

*Kerr, McCord & Carey,* for appellant.

*Florence Mayne Hickey,* for respondent.

MILLARD, J.—Plaintiff, as guardian of her husband, Roy S. Bloss, commenced two actions (which were consolidated for trial) to recover total permanent disability benefits from October 1, 1924, to date, upon two life insurance policies issued September 18, 1923, by the defendant insurance company to Roy S. Bloss. The insurer denied liability on the ground that due proof of total and permanent disability was not made as required by the insurance contracts prior to lapsation of the insurance contracts for non-payment of premiums due December 13, 1924.

The cause was tried to the court, which found that, on or shortly prior to September 1, 1924, and while the insurance policies were in full force and effect, the insured became wholly and permanently disabled, and that the defendant was given due notice and proof of such disability by Mary A. Bloss, the beneficiary under the policies, on and prior to December 10, 1924, before default in payment of any premium and after the disability had existed continuously for more than three months. Judgment was accordingly entered in favor of the plaintiff. The defendant has appealed.

While the two policies were issued September 18, 1923, both took effect as of the date of the application therefor, September 13, 1923, and are identical as to their terms. Each policy insured the life of Bloss in the sum of twenty-five hundred dollars payable to his wife upon receipt of due proof of death occurring

while the policies were in force, with double indemnity in case of accidental death. The insurer further agreed to pay an annuity to the insured and to waive payment of all insurance premiums in the event the insured became totally and permanently disabled. The pertinent provisions of the insurance contracts read as follows:

"If the insured becomes wholly and permanently disabled before age 60, the society will waive subsequent premiums and pay to the insured a disability annuity of twenty-five dollars a month subject to the terms and conditions contained on the third page hereof."

The material recitals on the third page of the contract are as follows:

"TOTAL AND PERMANENT DISABILITY. (1) DISABILITY BENEFITS before age 60 shall be effective upon receipt of due proof, before default in the payment of premiums, that the Insured became totally and permanently disabled by bodily injury or disease after this policy became effective and before its anniversary upon which the Insured's age at nearest birthday is 60 years, in which event the Society will grant the following benefits:—

"(a) Waive payment of all premiums payable upon this policy falling due after the receipt of such proof and during the continuance of such total and permanent disability; and

"(b) Pay to the Insured a monthly disability annuity as stated on the face hereof; the first payment to be payable upon receipt of due proof of such disability and subsequent payments monthly thereafter during the continuance of such total and permanent disability, . . .

"Disability shall be deemed to be total when it is of such an extent that the Insured is prevented thereby from engaging in any occupation or performing any work for compensation of financial value, and such total disability shall be presumed to be permanent

when it is present and has existed continuously for not less than three months . . ."

The first annual premium was paid to the soliciting agent, R. E. Johns, at the time the insured applied for the insurance. A quarterly premium of $40.80 on each policy became due September 13, 1924, and was paid. Such payment continued the policy in force until December 13, 1924, when another quarterly premium matured, but was not paid. Just prior to the payment of the September 13, 1924, premium, Bloss lost his position, and according to Mr. Johns, the agent who wrote the policies, Bloss went to the office of the insurer and informed the company that he intended to drop at least one of the policies. He was persuaded, however, at that time by Mr. Johns to keep the policies in force a little longer. Premium notices were sent to the business address of the insured as he directed.

When Bloss applied for the insurance, he stated that he had never had syphilis, when, in fact, he then had syphilis and probably had had that disease for a number of years prior to the date of his application for insurance. The affirmative defense of misrepresentation was not interposed by the appellant, which conceded that defense was not available by reason of the incontestable clause contained in the insurance contract.

In May, 1924, Bloss began to manifest mental incapacity by reason of the disease with which he was afflicted. He was unable to perform his work satisfactorily, and on that account lost his position with Wm. D. Perkins & Co., September 1, 1924. Two weeks later, Bloss accompanied his wife and two other persons on an automobile trip from Seattle to Pullman, and from that city to Seattle by way of Pendleton and Portland, Oregon. On that trip and after his return to Seattle, Bloss acted so irrationally as to alarm his wife.

A neighbor advised Dr. Minnie Burdon, a family

physician and family friend of the Blosses, of the actions of Bloss. Upon receipt of advice from that physician as to the condition of Bloss, and in response to the physician's suggestion that he visit his brother, Mr. Bloss's brother, Sidney Bloss, of Chicago, came to Seattle. Prior to that arrival, the family physician induced Bloss to go to a King county sanitarium which is an institution for the care of nervous and mental subjects. Bloss was detained in that institution and examined by certain physicians. An examination of Bloss on October 17, 1924, resulted in a tentative diagnosis of "beginning general paresis." That diagnosis confirmed the suspicion entertained sometime previously by Dr. Burdon. The laboratory tests made October 20, 1924, on both the blood and spinal fluid, were positive for syphilis, four plus.

The relations between Mrs. Bloss and Sidney Bloss became strained when the latter learned, on his arrival in Seattle, that his brother had been placed in the sanitarium by Mrs. Bloss. On October 26, 1924, Sidney Bloss took his brother to Chicago. On November 5, 1924, Roy S. Bloss wrote the following note to R. E. Johns (the agent who sold the insurance to Bloss) at Seattle:

"Dear Johns: Chicago, Ill., 11-5-24.
*"Hurrah for Coolidge!*
"I wish you would kindly change the beneficiary in my two policies 3252821 F 92961
325282(2)—not sure of last figure—to my daughter and send endorsements to me at Warner Hotel, E. 33rd & Cottage Grove, Chicago, Ill., also the same on Nat. Life U-12-431.
"I have no life insurance payable to my daughter and thought it only right to protect her.
"Don't know how long I'll remain here.
"Yours,
"R. S. Bloss."

Under date of November 8, 1924, Mr. Johns wrote to Mrs. Bloss as follows, in transmitting to her the foregoing letter of Mr. Bloss:

"Dear Mrs. Bloss:

"Inclosed letter from Mr. Bloss which explains itself. I of course will do nothing re changing beneficiary & Mr. Bloss cannot while he is ill.

"I am getting papers together so that we can apply for the indemnity under both policies & will advise you from time to time as to progress.

"Sincerely,

"R. E. JOHNS."

A short time prior to receipt of the letter from Mr. Johns, Mrs. Bloss was notified by her husband's former employer, Wm. D. Perkins, that he had learned from Mr. Johns of the existence of the two policies which became the subject matter of this controversy. That was the first information Mrs. Bloss had concerning the policies. Her husband had never told her that he had taken any policies in which she was named as beneficiary.

Learning of her husband's intention to change the beneficiary, Mrs. Bloss consulted an attorney. On December 10, 1924, she wrote to the appellant insurer as follows, on letterhead of Guie & Halverstadt, attorneys:

"Equitable Life Assurance Society of U. S.,

"303 Central Building,

"Seattle, Washington.

"Dear Sirs:

"My husband, Roy S. Bloss, has, I am informed, life and health policies Nos. 352821-352822 in your company. On or about October 17, 1924, he was examined by physicians who diagnosed the beginning of general paresis. We submit herewith copies of the findings of the diagnosticians, the originals of which are in my possession.

"I am sending you this notice for the purpose of conveying this knowledge to you that Mr. Bloss is in-

capacitated for authorizing or making change in his policy. Very truly yours,

"Mary A. Bloss,·
"4005 West Holgate St.,
"Seattle, Wash."

The enclosures read as follows:

"ARTHUR P. CALHOUN, M. D.

"E. H. Guie, Atty.,       Cobb Building,
"Marion Bldg.,          Seattle, Dec. 4, 1924.
"Seattle, Wash.
"Dear Sir:

"At the request of Mrs. R. S. Bloss, through Dr. Burdon, I wish to report my findings in Mr. Bloss's case.

"I first saw him at the Meadows Sanatorium on Oct. 17, 1924, at which time I made a tentative diagnosis of beginning general paresis. After consultation with Dr. Burdon it was decided to have laboratory tests done on both the blood and spinal fluid. This was done by Dr. Nickson of the Swedish Hospital on Oct. 20th. On the 22nd he reported that both blood and spinal fluid showed four plus ( + + + + ) in Wasserman tests.

"These tests corroborated the former mental findings so that a definite diagnosis of beginning general paresis was made. This is a form of insanity commonly known as softening of the brain and is incurable. The length of life averages 18 months to 2 years after the onset.

"If there is any further information you desire I will be pleased to report it at any time,

"Yours truly,
"A. P. Calhoun, M. D."

"THE SWEDISH HOSPITAL INCORPORATED
"Summit Ave. at Columbia St.
"Seattle, Washington.

"Mr. E. H. Guie. ·
"Dear Sir:

"Dr. Minnie Burdon has requested us to send you a copy of the Wasserman findings in the case of Mr. R. S. Bloss.

"They are:          Noguchi          Cholesterini
"Blood was          4+               4+
"Sp. Fluid          4+               4+
                         "D. H. Nickson."

Sometime between November 8, 1924, the date of Mr. Johns' letter to Mrs. Bloss concerning the desire of Mr. Bloss to change beneficiary, and December 10, 1924, the date of the letter of Mrs. Bloss to the appellant, Mr. Johns wrote the following letter to Mrs. Bloss:

"Get 2 letters from Dr. Calhoun re Mr. Bloss condition with dates. Mail one copy to Nat. Life with letter of explanation & one to Equitable with letter of explanation—Mr. DeRose, Cashier.
                    "R. E. Johns, Ell. 7437"

The only purpose of Mrs. Bloss in writing to the appellant on December 10, 1924, was clearly expressed. It was to prevent Mr. Bloss from changing the beneficiary. It did not constitute, nor did Mrs. Bloss intend that letter to constitute, notice to the appellant that Mr. Bloss was then "totally and permanently disabled" by the disease. She advanced no claim for total and permanent disability, nor did she make any claim for waiver of subsequently maturing premiums. She stated to appellant in that letter, which was written three days prior to the date the quarterly premium matured:

"I am sending you this notice for the purpose of conveying the knowledge to you that Mr. Bloss is incapacitated for authorizing, or making change in his policy."

The two reports enclosed with the letter of December 10, 1924, to the appellant, were to the effect that one physician, on October 17, 1924, made a tentative diagnosis of beginning of general paresis, and that the laboratory tests of October 20, 1924, corroborated that finding. Mrs. Bloss, accompanied by a Mr. Cole, per-

sonally delivered, on or after December 10, to the appellant at its Seattle office, her letter to it of December 10, 1924, with the two reports of the physicians. The evidence discloses that no subject was then discussed between the parties other than the matter of the premium due December 13, 1924. Nothing was said or done to induce respondent to think that the premium did not have to be paid, nor that the appellant would not require the requisite proof. Mr. Cole testified that he said to appellant's cashier that "we must not by any manner or means allow this policy to lapse." Mrs. Bloss testified that she told appellant's cashier that she had come to the office to leave the doctors' findings with him

". . . as requested, or as told to me by Mr. Johns to do, so that he would have them there in regard to or concerning Mr. Bloss's disability insurance—to show proof of his disability."

The next quarterly premium due on December 13, 1924, as stated above, was never paid. However, the policies would not have lapsed had the premiums been paid within the grace period of thirty-one days thereafter.

On February 13, 1925, Mrs. Bloss called at appellant's office in Seattle and was orally notified that the policies had lapsed for non-payment of the December, 1924, premiums. On April 7, 1925, Mrs. Bloss wrote as follows to the appellant for information respecting the payment of the last premiums on the two policies:

"Will you kindly advise me of the last premium paid on the policy numbered 352821-352822 held by Mr. R. S. Bloss, and oblige."

In reply to that inquiry, appellant advised Mrs. Bloss, under date of April 18, 1925, that:

"We have your letter of April 7, 1925, with reference to the above numbered policies.

"Our records indicate that these policies were issued on September 13, 1923, on the convertible annual dividend plan, for $2500., each, and with quarterly premiums of $40.80, under each policy.

"Both policies lapsed through the non-payment of the premium due under each policy on December 13, 1924. The policies have no value of any kind."

Roy S. Bloss remained in Chicago with his brother Sidney from October 26, 1924, until his return to Seattle in July, 1925. The record does not disclose what his condition was between the time of his departure for Chicago and his return to Seattle. He corresponded regularly with his daughter, who, during that period, was attending the Washington State College. Those letters were given by the daughter to her mother, who destroyed them. The daughter did not testify.

On his return alone to Seattle in July, 1925, and without advance notice of his coming to his wife, who first saw him in Seattle at the office of her lawyer, negotiations were begun between the husband and wife which resulted in a separation agreement and property settlement on September 2, 1925. Under the terms of that agreement, Mrs. Bloss became the separate owner of the family home in West Seattle, and Mr. Bloss became the separate owner of a three-acre tract near Redondo Beach. Thereafter, Mr. Bloss lived on that tract alone.

His mental condition became progressively worse, and in December, 1928, he was found helpless in his cabin. He was removed to a Seattle hospital, from which he was taken to a private institution for the care of nervous and mental cases, where he remained from December, 1928, until May, 1932, when he was adjudged insane and was committed to the state hospital for the insane at Sedro Woolley. Letters of

guardianship were issued to Mrs. Bloss on February 3, 1932.

On February 5, 1932, Mrs. Bloss, through her attorney, wrote a letter to the appellant as follows:

"As attorney for Mary A. Bloss, guardian of Roy S. Bloss, a mental incompetent, I am enclosing herewith certified copy of her letters of guardianship, issued by the Clerk of the Superior Court of King County, Washington, upon order of Judge Everett Smith entered February 2, 1932, and am authorized to make demand upon your company for payment, with accrued interest, of disability benefits under two of your policies, Nos. 3,252,821 and 3,252,822, in which Roy S. Bloss is insured in the sum of $2500 in each policy and the sum of $25.00 is payable monthly on each upon the permanent and total disability of the insured before the age of sixty.

"At the age of 49 years, Roy S. Bloss became mentally incompetent and physically disabled from a disease diagnosed by competent medical authority as general paresis in October, 1924, while these policies were in full force and effect. By reason of his mental condition, he lost his position in the month of September, 1924, and never thereafter held or was able to take another position, he having been under medical treatment and confined in sanitoriums the greater part of the time since said date. He is now confined in the Mason Home, 314 East Mercer Street, Seattle, Washington, and is hopelessly afflicted with the disease.

"No guardian was ever appointed for Mr. Bloss until the present time, and he, being mentally incompetent, did not recognize his own condition or know that his disability annuity was due under his policies, but actual notice of the situation and of Mr. Bloss' condition was given your company by Mary A. Bloss, wife of the insured, in the fall of 1924 while the policies were in full force and before any premium thereon became delinquent, and she furnished to the company as proofs all that was required of her at the time, including medical certificates, but for some reason

the claim was not paid. Your records, if they have been kept, will show these facts to be true.

"In any event, and whether or not you recognize the information so given you by Mrs. Bloss as satisfactory notice of the disability, she is now in her official capacity as guardian of Roy S. Bloss giving you that notice on behalf of Mr. Bloss under authority of the Court, the notice relating back to a date on or about October 1, 1924, at which time Mr. Bloss became physically disabled and mentally incompetent to transact his own business affairs. She will fill out whatever blanks and furnish whatever other information you desire, on request.

"Due to the fact that this matter has been before your company for more than seven years, without conclusion, we must ask that you act promptly at this time. Unless arrangements are instituted looking toward the payment of this claim within one week from this date, the guardian will be compelled to take legal action upon the two policies."

The appellant replied thereto as follows, under date of February 25, 1932:

"Your letter of February 5 addressed to our Washington office has been referred to this department for attention.

"The previous correspondence of which you speak in your letter, is of course, on file with the Society, and we find that the matter was fully considered at that time. We have before us the statements which were completed in connection with the alleged disability claim presented to the Society at that time. On the face of it, they do not establish a claim for total and permanent disability benefits under these policies, and the matter was gone into thoroughly at that time; and on the strength of the reports furnished in behalf of the insured as well as outside reports which we secured, there could be no claim for disability allowed in this case."

It would appear from a letter dated February 6, 1929, from the appellant to Mrs. Bloss, that, some-

time in 1928 or 1929, the respondent submitted a claim for disability benefits, which was rejected. That letter reads as follows:

"Mrs. Mary Ames Bloss,                February 6, 1929.
"707 Linden Ave.,
"Pullman, Wash.        Policy No. 3252 821 - 822
                                Roy S. Bloss.

"Dear Madam:
    "We submitted the papers in connection with claim for disability under the above policies, and we regret to advise that the Society are unable to entertain a claim for disability benefits under these policies owing to the fact that the policies lapsed on December 13, 1924.                    Yours very truly,
                            "C. W. DeRose,
                            "Agency Cashier."

On February 12, 1929, appellant's Seattle cashier wrote to soliciting agent Johns as follows:

    "You will find enclosed check for commissions as per statement attached.

    "In connection with Policies above mentioned, we came across the correspondence from the Society in connection with this disability claim, and according to the statement from Mary Ames Bloss, Mr. Bloss was obliged to give up all work October 17, 1924, and the policies lapsed December 13, 1924.

    "We submitted the preliminary papers to the Society January 19th and they replied on January 31st that as these policies lapsed through non payment of the premiums which became due December 13, 1924, they are not in a position to act in connection with this disability claim."

It is appellant's position that disability benefits were not payable under the terms of the policies, in view of the fact that due proof of total and permanent disability was not made before default in payment of the premiums due December 13, 1924. Respondent insists (1) that notice and proof of total and permanent disability were actually given to the appel-

lant by the insured's wife, Mary A. Bloss, prior to the lapsation of the policies for non-payment of premiums; (2) that notice and proof were not necessary because the insanity of the insured excused him from performing the conditions of the contract while that disability persisted; and (3) that formal proof of loss was waived by the insurer.

In *Wick v. Western Union Life Ins. Co.*, 104 Wash. 129, 175 Pac. 953, the insurance policy contained a total disability indemnity provision identical in effect with the disability indemnity provision in the case at bar. The pertinent policy provision in the case cited was as follows:

"Total Disability. If the insured before attaining the age of sixty years shall furnish due proof that he has, before default in the payment of any premium, become wholly disabled by bodily injury or disease and will be permanently, continuously and wholly prevented thereby from pursuing any and all gainful occupations, the company will pay for said insured all premiums which shall become due and payable during the continuance of such disability."

The insured was disabled while the policy was still in force, but no proof was furnished until after the policy had lapsed for non-payment of premiums. We held that recovery could not be had as the insured was bound by the provision contained in the insurance contract that due proof of total and permanent disability before default in the payment of premium was a condition precedent to a recovery on the policy.

The United States supreme court, in *Bergholm v. Peoria Life Ins. Co.*, 284 U. S. 489, held that receipt of due proof of total and permanent disability before default in the payment of the premium was a condition precedent to recovery under the policy. In that cause, which was brought in the district court of the United States for the northern district of Texas to recover

the sum of five thousand dollars life insurance and specified disability benefits upon a policy issued by the defendant insurer to Carl Oscar Bergholm on March 13, 1926, judgment was entered in favor of the plaintiff. That judgment was reversed by the United States circuit court of appeals, fifth circuit. In affirming the judgment reversing the recovery, the United States supreme court said:

"Beginning with February 27, 1927, premiums were to be paid quarterly, with a grace period of one month from any due date, during which period the policy was to continue in full force. In case of total and permanent disablement there was a provision for payment of a monthly income for life of one per cent of the amount of the principal sum. The policy expressly provided that 'if any premium is not paid on the date when due, this policy shall cease and determine, except as hereinafter provided.' The 'income disability' clause, which follows this language, provides:

" 'Upon receipt by the Company of satisfactory proof that the Insured is totally and permanently disabled as hereinafter defined the company will

" '1. Pay for the Insured all premiums becoming due hereon after the receipt of such proof and during the continuance of the total and permanent disability of the Insured and will also

" '2. Pay to the Insured a Monthly Income for life of 1% of this Policy; The first payment of such income to be paid immediately upon receipt of such proof . . .

" '3. . . . . To entitle the Insured to the above Total and Permanent Disability Benefits this policy at the time of making claim for such benefits must be in full force and all premiums becoming due prior to the time of making claim must have been duly paid. . . .'

"The insured died on April 18, 1929. Judgment was sought for disability benefits from December 1, 1927, to April 1, 1929, at the rate of $50 per month, with interest. The last premium paid was due on May 27, 1927. The next, allowing a month's period of

grace, should have been paid not later than September 27, 1927. Neither that nor any subsequent premium was ever paid. Long prior to the death of the insured, the policy, therefore, had lapsed, unless saved by the terms of the disability clause above quoted. There is evidence in the record from which it reasonably may be found that the insured was totally and permanently disabled from a time before the premiums first became in arrears, and that this condition continued until his death; but no proof thereof was furnished to the company.

"The petitioners, nevertheless, contend that this is enough to bring into effect the promise of the company to pay the premiums which became due after the disability began. In support of this contention, *Minnesota Mut. Life Ins. Co. v. Marshall, supra,* [29 Fed. (2d) 977] is cited. The pertinent provisions of the policy there, however, differ from those found in the policy here under consideration. There the policy provided that if the insured, while the policy was in force and before default in payment of premiums, 'shall become totally and permanently disabled . . . and shall furnish satisfactory proof thereof, the Company will waive the payment of premiums thereafter becoming due,' and that 'upon the receipt of due proof of total and permanent disabilities . . . the Company will waive the payment of all premiums thereafter becoming due.' The court held that the waiver took effect at the time of the disability, and did not depend upon the time when proof thereof was furnished.

"We do not need to controvert this construction of the words quoted, or question the soundness of the view of the court that the existence of the disability before the premium became in arrears, standing alone, was enough to create the waiver. In that view, the obligation to furnish proof was no part of the condition precedent to the waiver; but such proof might be furnished within a reasonable time thereafter. Here the obligation of the company does not rest upon the existence of the disability; but it is the receipt by the company of *proof* of the disability which is definitely made a condition precedent to an assumption by it of

payment of the premiums *becoming due after the receipt of such proof*. The provision to that effect is wholly free from the ambiguity which the court thought existed in the Marshall policy. Compare *Brams v. New York Life Ins. Co.*, 299 Pa. 11, 14; 148 Atl. 855. It is true that where the terms of a policy are of doubtful meaning, that construction most favorable to the insured will be adopted. *Mutual Life Ins. Co. v. Hurni Co.*, 263 U. S. 167, 174; *Stipcich v. Insurance Co.*, 277 U. S. 311, 322. This canon of construction is both reasonable and just, since the words of the policy are chosen by the insurance company; but it furnishes no warrant for avoiding hard consequences by importing into a contract an ambiguity which otherwise would not exist, or, under the guise of construction, by forcing from plain words unusual and unnatural meanings.

"Contracts of insurance, like other contracts, must be construed according to the terms which the parties have used, to be taken and understood, in the absence of ambiguity, in their plain, ordinary and popular sense. *Imperial Fire Ins. Co. v. Coos County*, 151 U. S. 452, 462-463. As long ago pointed out by this court, the condition in a policy of life insurance that the policy shall cease if the stipulated premium shall not be paid on or before the day fixed is of the very essence and substance of the contract, against which even a court of equity cannot grant relief. *Klein v. Insurance Co.*, 104 U. S. 88, 91; *New York Life Ins. Co. v. Statham*, 93 U. S. 24, 30-31; *Pilot Life Ins. Co. v. Owen*, 31 F. (2d) 862, 866. And to discharge the insured from the legal consequences of a failure to comply with an explicitly stipulated requirement of the policy, constituting a condition precedent to the granting of such relief by the insurer, would be to vary the plain terms of a contract in utter disregard of long-settled principles."

In *Smith v. Missouri State Life Ins. Co.*, 134 Kan. 426, 7 P. (2d) 65, in which the policy in controversy contained a disability provision like that in the case at bar, the insured was adjudged insane. An action

was instituted to recover under the total and permanent disability provision of the policy. The defense was there interposed, as in the case at bar, that the policy had lapsed for non-payment of premium prior to submittal of due proof of total and permanent disability. In holding that the insanity of the insured did not excuse the failure to make the stipulated proof, the court said:

"The clause under consideration is a part of the policy and must be construed in the light of the other provisions of the policy. From this we glean that the intent of the provision was to provide an additional way in which the premium might be paid, or the insured excused from the payment of premium. The plain language of the policy is: 'After one full annual premium shall have been paid and before default in payment of any subsequent premium, if the Insured . . . shall furnish evidence satisfactory to the Company that he has been wholly disabled . . . the Company, during the continuance of such disability, will waive payment of any premium payable under this policy as it becomes due . . .' There is no ambiguity in the language used. The fact of disability must exist, and notice thereof must be conveyed to the company before default is made in the payment of the premium. In other words, under the terms of this policy, there are several ways in which the premium may be accounted for: First, payment in cash. Second, through the operation of the automatic premium loan, if the loan value is sufficient to pay the premium due. Third, if the insured is wholly disabled and proof of such disability is furnished the company, the premium is waived. The fact of disability, plus the act of notice, equals payment, which can only be made within the time stated in the policy. . . .

"In *Wick v. Western Union Life Ins. Co.,* 104 Wash. 129, the insured was a school teacher, and by reason of tumor of the brain he was compelled to abandon his school March 31, 1915, and was unable to work at any gainful occupation. The premium was due May 1, 1915. The company notified the insured before the

premium was due and again during the running of the grace period. He died December 31, 1915, without notifying the company of his disability. The court held:

"'Notice of total disability must be given prior to default and cancellation for non-payment of premiums, under a policy of life insurance, providing that if the insured, before attaining the age of sixty, shall furnish proof that he "has," before default, become wholly disabled, the company shall pay for him all premiums "which shall become due" during the continuance of the disability; especially in view of other provisions of the policy requiring insured, upon request, to give proof of continuance of the disability, and limiting the period of grace for payments to one month pursuant to Rem. Code, § 6059-184, during which time the policy "shall remain in full force and effect."' (Syl. § 2.)

"It is impossible to entirely reconcile the two lines of authority. We think, however, that there is a distinction in that in the one line of cases the courts have gone far afield to find an ambiguity in the contract, and have overlooked the fact that the contract does not pretend to insure against disability but merely makes disability, when coupled with proof or notice to the company, a settlement or waiver of the premium. The contract is made for the benefit of the insured. On the one hand the company obligates itself in the event of total disability to carry the insurance without charge to the insured, and on the other hand the insured obligates himself to furnish, while the policy is in force, proof of such disability. The contract is neither unreasonable nor harsh.

"Touching the contention that insanity should excuse the furnishing of proof, it will be noted that the law is settled beyond any question that insanity does not excuse the payment of premium, and if it does not excuse the payment of premium there is no reason why it should excuse the failure to furnish proof of disability. On its face the rule may seem harsh, but an examination into the basic principles of the insurance contract is convincing that it is sound and reasonable. The payment of premium is the life of the contract.

All actuarial calculations are based upon the payment of premium at the time specified in the contract, and by reason thereof the state is able to determine whether the company can make good its contracts. If the beneficiary may wait until more than a year after the claimed disability and the death of the insured to make the claim of total disability, which is generally a question of fact, then the certainty of liability of insurance companies cannot be established nor the amount of their reserve definitely determined. Anything that destroys the certainty of contracts necessarily affects the whole structure, and the sacredness of contracts should not be unnecessarily invaded or impaired by judicial interpretation.''

Applying the foregoing principles to the facts in the case at bar, it is clear that respondent is not entitled to a recovery under the provisions of the contract, inasmuch as due proof was not made of total and permanent disability prior to default in the payment of premium.

The notice given to appellant by respondent in December, 1924, did not constitute proof of total and permanent disability. As stated above, it was not intended to, nor did it purport to, be proof of total and permanent disability. The information that Bloss had the ''beginning of general paresis'' was not proof of a then existing ''total and permanent disability'' from disease sufficient to suspend the payment of subsequently maturing premiums. The appellant was under no obligation under the terms of the policies to institute an investigation to ascertain whether the insured was totally and permanently disabled. Unless there was a demand—there was none—by Bloss, or some-one acting in his behalf, for the suspension of payment of premiums, there was no reason for an investigation by the appellant, which complied with the only demand—that it change not the beneficiary—made upon it.

Appellant did not waive the requirement of due proof of total and permanent disability prior to default in the payment of premiums. On the occasion of the call of Mrs. Bloss and Mr. Cole at the Seattle office of appellant, appellant's cashier did not say or do anything to induce the belief on the part of Mrs. Bloss that the December, 1924, premium did not have to be paid, nor that the appellant would not require proof of disability prior to default in payment of premiums. Mrs. Bloss knew that the policies would lapse if the premiums were not paid.

*Pagni v. New York Life Ins. Co.,* 173 Wash. 322, 23 P. (2d) 6, relied upon by respondent, is not in point. In that case, there was evidence that the insurer clothed its soliciting agent with authority to act for it in the matter of preparing and transmitting the necessary blanks on which to furnish proof of total and permanent disability. Such is not the situation in the case at bar. In *Pagni v. New York Life Ins. Co., supra,* the insured made claim for disability benefits and did everything required of him by the authorized representative to make proof of total and permanent disability. Such facts are not present in the instant case. We did not hold that notice and proof were the same thing when the insurance contract provided for proof. The case cited is distinguishable on the facts from the case at bar.

The judgment is reversed, and the cause remanded with direction to the superior court to dismiss the action.

STEINERT, MAIN, and MITCHELL, JJ., concur.

BLAKE, J. (dissenting)—The policy defines total disability to be such that "the insured is prevented thereby from engaging in any occupation or performing any work for compensation of financial value."

That Bloss was disabled to such a degree, there is no doubt. He lost his position for that reason in September, 1924, and never again performed work "for compensation of financial value." I think that the letter of Mrs. Bloss, under date of December 10, 1924, accompanied, as it was, by the diagnosis of Doctor Calhoun and the clinical report of Nickson, constituted "due notice" to appellant of such disability.

Printed on the policy are the following words:

"It is not necessary to employ any person, firm or corporation to collect the insurance or secure any benefit under this policy. Write direct to the society, 120 Broadway, New York, or communicate with the nearest authorized agent of the society whose duty it is to facilitate all settlements without charge."

The policies do not require the filing of a *claim* on account of such disability, but merely *notice* of it. Neither do the policies define "due notice" or specify the manner of making it. It seems to me that, when the insurance company was advised that the insured, because of incipient general paresis, was so incapacitated that he was not competent to make a change of beneficiary, it thereby received "due notice" of his total disability.

[En Banc. June 15, 1934.]

## ORDER.

The above-entitled cause having been first heard November 8, 1933, by a Department of the court, which reversed the judgment of the superior court and remanded the cause with direction to dismiss the action;

And a petition for rehearing having been granted, and the cause having been argued to the court *En Banc,* June 4, 1934, with seven judges sitting, the cause being submitted to another judge on the briefs (the chief justice being disqualified);

And the eight judges being equally divided in their opinions, there is no constitutional majority either for affirmance or for reversal.

The judgment of the trial court therefore stands affirmed.

By the Court:

WALTER B. BEALS,
Chief Justice.

MILLARD and STEINERT, JJ. (dissenting)—We dissent. We adhere to the views expressed in the Departmental opinion.