IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| WALTER L. TAMOSAITIS PHD, an individual, and SANDRA B. TAMOSAITIS, representing the marital community,<br><br>Appellants,<br><br>v.<br><br>BECHTEL NATIONAL, INC., a Nevada Corporation, URS CORPORATION, a Nevada Corporation, FRANK RUSSO, an individual, GREGORY ASHLEY, an individual, WILLIAM GAY, an individual, DENNIS HAYES, an individual, and CAMI KRUMM, an individual,<br><br>Respondents. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | No. 31451-1-III<br>(consolidated with<br>No. 31789-7-III)<br><br><br><br>PUBLISHED OPINION |

KORSMO, J. — After a series of escalating professional disagreements and souring interpersonal relationships, Dr. Walter Tamosaitis was reassigned by his employer at the request of the project's general manager, Bechtel National, Inc. (Bechtel), but did not lose any pay. Dr. Tamosaitis then brought state, federal, and administrative suits against

numerous defendants, including this state court action against Bechtel and its employees Frank Russo and Gregory Ashley, for intentional interference with a business relationship. Because Dr. Tamosaitis failed to carry his burden of production with regard to proof of damages, we affirm.[1]

## FACTS

Dr. Tamosaitis spent more than 40 years working in the chemical and nuclear industries, working for URS Corporation, its predecessors, and its subsidiaries during most of that time. Most recently, Dr. Tamosaitis worked for URS Energy and Construction, Inc. In 2003, Dr. Tamosaitis moved to Washington State to work for URS on its contract at the Hanford Waste Treatment Plant (WTP). From 2003 to 2010, he helped manage design and construction at the Hanford Nuclear Reservation.

The design and construction of the WTP is a federal project under the purview of the United State Department of Energy (DOE). Bechtel is DOE's prime contractor on this project. URS in turn is a subcontractor for Bechtel.

Prior to the reassignment at issue, Dr. Tamosaitis served as manager of the project's Research and Technology Group. Throughout 2009 and 2010, this group was

---

[1] Although we doubt Dr. Tamosaitis's ability to satisfy other elements of his cause of action, we do not address those elements in an effort to avoid cluttering the reporter volumes with dicta. Discussion of the other elements would not provide guidance to future litigants given the unique and highly fact specific nature of this case. Accordingly, we do not address the other arguments and nothing in this opinion should be read as endorsing the other elements at issue in this case.

2

responsible for closing "M3." M3 was the last of a group of major issues identified in 2005-06 by a DOE review team (which included Dr. Tamosaitis) that needed to be solved before other parts of the WTP's design and construction could proceed.

In early 2010, Bechtel made a number of management changes on its end of the project. Bechtel made Frank Russo the director of the WTP and moved Gregory Ashley, another Bechtel employee, under Mr. Russo's direct supervision. Mr. Ashley had previously been under the supervision of assistant director Bill Gay, a URS employee.

For a number of reasons, Dr. Tamosaitis could not establish a good professional relationship with Mr. Russo and Mr. Ashley. One large impediment was the increasing pressure on Bechtel to close the M3 issue. In April of 2010, DOE decided to condition an approximately $5,000,000 incentive fee on Bechtel's ability to close M3 on June 30, 2010. Bechtel also hoped that timely closure of all of the review team issues would persuade Congress to allocate an additional $50,000,000 to the WTP.

It initially appeared that M3 would close on schedule. However, an unexpected problem arose in the spring of 2010 when outside engineers found a flaw in the testing parameters that were used to validate the design functionality of the pulse jet mixers that were to be installed at the WTP. Dr. Tamosaitis and a number of other engineering professionals concurred in this finding and called for additional testing.

Additional testing, however, would have prevented the timely closure of the M3 issue and jeopardized additional federal funding. Because Bechtel wanted nothing more

than to close M3 on time, Dr. Tamosaitis's concurrence in the call for additional testing put him at loggerheads with Bechtel. To keep the M3 closure on schedule, Mr. Russo solicited contrary opinions from other professionals, and also tried to get some of the dissenting professionals to retract their opinions. This did not sit well with Dr. Tamosaitis, but ultimately Bechtel and Mr. Russo prevailed in getting closure of the M3 issue on June 30, 2010.

That same day, Mr. Russo sent an e-mail to the entire M3 team, congratulating them on a job well done. The next day, Dr. Tamosaitis privately commented via e-mail about Mr. Russo's e-mail to some of the consultants and professionals who had supported his position. This e-mail contained some language about the Consortium for Risk Evaluation with Stakeholder Participation (CRESP), one of the outside organizations that advised Bechtel on the M3 closure issue. Dr. Tamosaitis's comments ended up being forwarded to CRESP. CRESP's director found Dr. Tamosaitis's comments disparaging and a misrepresentation of its position with regard to M3.

CRESP expressed these concerns to Mr. Ashley, who then called Mr. Russo and asked him to get Dr. Tamosaitis kicked off the WTP project. Mr. Russo then sent an e-mail to URS's Bill Gay, saying, "Walt[er Tamosaitis] is killing us" and "Get him into your corporate office today." CP at 1763, 1765. Mr. Gay removed Dr. Tamosaitis from his role at the WTP.

4

URS did not terminate Dr. Tamosaitis's employment and he did not lose any pay as a result of the reassignment. However, Dr. Tamosaitis did lose some books and other personal items of value when Bechtel and URS prohibited him from returning to his WTP office after the reassignment. Dr. Tamosaitis's removal also negatively affected his mental health, causing him to start taking depression and anxiety medication. Dr. Tamosaitis further claimed that his removal negatively affected his professional reputation throughout the sphere of DOE contractors and prevented him from advancing to URS's executive pay grades. Finally, Dr. Tamosaitis presented some evidence suggesting that his removal resulted in him not being considered for some other positions at the WTP, although there was no evidence showing that any of these positions would have resulted in higher pay or benefits.

A few months after his removal and reassignment, Dr. Tamosaitis brought this cause of action against Bechtel, Mr. Russo, and Mr. Ashley for intentional interference with his business relationship with URS—specifically, tortious interference with Dr. Tamosaitis's employment relationship with URS. After a period of discovery and a failed attempt to remove this case to federal court, the defendants brought a motion for summary judgment. The trial court granted summary judgment on a number of grounds and Dr. Tamosaitis appealed. He initially sought direct review by the Supreme Court, but the motion was denied and the Supreme Court transferred the case to this court per RAP 4.2(e)(1).

While this appeal was pending, URS informed Dr. Tamosaitis in early 2013 that he would not be receiving an incentive pay bonus for the first time in his history with the company. URS stated that reinstatement of incentive pay would be conditioned on Dr. Tamosaitis obtaining an assignment on another URS contract. Dr. Tamosaitis had not worked on another URS contract since shortly after leaving the WTP. However, he still received incentive pay in 2011 and 2012.

Dr. Tamosaitis then moved in superior court for CR 60 relief based on his new evidence of damages. The court denied the motion and Dr. Tamosaitis appealed that decision to this court. The two appeals were consolidated.

After the consolidation, URS formally terminated Dr. Tamosaitis's employment in October 2013. Dr. Tamosaitis moved in his brief to supplement the record with evidence of his termination. Bechtel moved to strike the brief containing the materials.

## ANALYSIS

We address, in order, the summary judgment ruling, the motions relating to

6

supplementation of the record, and the order denying CR 60 relief.[2]

*Summary Judgment*

Review of summary judgment is pursuant to well understood principles. The appellate court engages in the same inquiry as the trial court. *Mountain Park Homeowners Ass'n v. Tydings*, 125 Wn.2d 337, 341, 883 P.2d 1383 (1994). "This court will affirm summary judgment if no genuine issue of any material fact exists and the moving party is entitled to judgment as a matter of law." *Id.* "All facts and reasonable inferences are considered in the light most favorable to the non-moving party, and all questions of law are reviewed de novo." *Id.* However, "a question of fact may be determined as a matter of law when reasonable minds can reach only one conclusion." *Miller v. Likins*, 109 Wn. App. 140, 144, 34 P.3d 835 (2001).

---

[2] RAP 10.4(b) limits a respondent's brief to no more than 50 pages. Although the respondents' initial brief contains exactly 50 full pages, its excessive use of footnotes, 47 in all, is clearly intended to circumvent the page limits set by RAP 10.4(b). Many of these footnotes take up a third of a page or more, and contain core facts and substantive argument intended to directly support the respondents' argument for affirming summary judgment. Had the respondents put these items in the body of their brief, the brief would have greatly exceeded the 50 page limit.

We have repeatedly told parties to make their argument in the body of their brief, not their footnotes. *State v. Harris*, 164 Wn. App. 377, 389 n.7, 263 P.3d 1276 (2011); *State v. N.E.*, 70 Wn. App. 602, 606 n.3, 854 P.2d 672 (1993); *State v. Johnson*, 69 Wn. App. 189, 194 n.4, 847 P.2d 960 (1993). We have also rejected attempts to circumvent the page limits by trying to incorporate by reference pages from arguments made at the trial court. *Diversified Wood Recycling, Inc. v. Johnson*, 161 Wn. App. 859, 890, 251 P.3d 293 (2011). While the complicated nature of this case likely justified the need for over-length briefing, we have rules for seeking permission to file an over-length brief. RAP 10.4(b).

"To prove tortious interference, the plaintiff must produce evidence sufficient to support all the following findings: (1) the existence of a valid contractual relationship or business expectancy; (2) the defendant's knowledge of and intentional interference with that relationship or expectancy; (3) a breach or termination of that relationship or expectancy induced or caused by the interference; (4) an improper purpose or the use of improper means by the defendant that caused the interference; and (5) resultant damage." *Eugster v. City of Spokane*, 121 Wn. App. 799, 811, 91 P.3d 117 (2004). As previously stated, we solely address the final element of damages.

Bechtel primarily argues that the "resultant damage" element requires some evidence of damages that are of pecuniary value and cites to Washington cases that stated as much in passing. *See e.g., Newton Ins. Agency & Brokerage, Inc. v. Caledonian Ins. Grp., Inc.*, 114 Wn. App. 151, 158, 52 P.3d 30 (2002). We now expressly hold that a claim of tortious interference with a business expectancy requires a threshold showing of resulting pecuniary damages.

Washington courts have had few opportunities to consider what types of damages are compensable under this tort and none of those cases have dealt with the issue of whether any one type of damages must be present as a threshold matter. *See Cherberg v. Peoples Nat'l Bank of Wash.*, 88 Wn.2d 595, 564 P.2d 1137 (1977) (emotional distress); *Mutual of Enumclaw Ins. Co. v. Gregg Roofing, Inc.*, 178 Wn. App. 702, 315 P.3d 1143 (2013) (loss of reputation), *review denied*, 180 Wn.2d 1011 (2014).

8

In the absence of local authority, the Washington State Supreme Court has historically relied on the provisions of the *Restatement (Second) of Torts* to guide the development of this tort in Washington. *See, e.g., Sea-Pac Co., Inc. v. United Food and Commercial Workers Local Union 44*, 103 Wn.2d 800, 699 P.2d 217 (1985); *Calbom v. Knudtzon*, 65 Wn.2d 157, 396 P.2d 148 (1964). Recently, Division Two of this court partially adopted the *Restatement*'s damages section for this tort. *Mutual of Enumclaw*, 178 Wn. App. at 714. Following these examples, we too look to the *Restatement* for guidance.

The *Restatement* expressly characterizes this tort as one stemming from wrongful interference with a business relationship that would be of pecuniary value. *Restatement (Second) of Torts* § 766B cmt. c (1979). The *Restatement* goes on to explain that this tort generally does not cover other noncommercial relationships such as "interference with personal, social and political relations." *Id.* In some states, a similar tort has been recognized for tortious interference with some noncommercial activities, including interference with gift or inheritance, interference with winning a prize contest, and interference with obtaining benefits from natural resources. *See id.* § 774B and accompanying Special Note. However, the *Restatement* notes that each of these noncommercial activities involves some element of measurable pecuniary value. *Id.* § 766B cmt. c.

9

*Restatement* § 766(B), cmt. (g), concerning the tort of interference with a business expectancy, directs the reader to *Restatement* § 766, cmt. (t), which addresses the related tort of interference with a contract. That comment expressly provides:

> The cause of action is *for pecuniary loss resulting* from interference. Recovery may also be had for consequential harms for which the interference was a legal cause.

*Restatement (Second) of Torts* § 766 cmt. (t) (1979) (emphasis added).

We conclude that the *Restatement* contemplates pecuniary loss as a threshold element for recovery under the tort of interference with a business relationship just as it is for the tort of interference with a contract. Additional damages may be recoverable in conjunction with the pecuniary loss.

Dr. Tamosaitis has not provided this court with any cases or other authority supporting his position. He cites *Cherberg* to show that other forms of damages are compensable under this tort. However, even the plaintiff in *Cherberg* showed some minimal pecuniary loss, $3,100 in lost profits, before obtaining secondary forms of damages. *Cherberg*, 88 Wn.2d at 600. The plaintiff in *Mutual of Enumclaw* also suffered some pecuniary loss, $530 in lost profits. *Mutual of Enumclaw*, 178 Wn. App. at 710, 725.

Courts outside of Washington have dismissed lawsuits brought under this tort for the plaintiff's failure to prove any pecuniary loss. In at least one reported case a court dismissed a cause of action under this tort at summary judgment because the employees,

10

who were wrongfully suspended, did not lose any pay. *Kent v. Iowa*, 651 F. Supp.2d 910, 961 (S.D. Iowa 2009). The court observed that while the investigation, discipline, and rumor mill concerning certain allegations made the employees' jobs more difficult to perform, the fact that they still remained employed and had not lost any pay during the investigation precluded their cause of action due to a lack of pecuniary loss. *Id. Kent* is factually similar and persuasive.

The Appeals Court of Massachusetts addressed the necessity for proof of pecuniary loss resulting from interference with a business expectancy in *Tech Plus, Inc. v. Ansel*, 59 Mass. App. Ct. 12, 793 N.E.2d 1256 (2003). There a trial court had set aside a verdict in favor of the plaintiff for interference with a business expectancy due to failure to prove pecuniary loss. *Id.* at 1260. Citing earlier rulings, the appellate court affirmed on the basis that plaintiff had failed to establish the pecuniary loss element of the tort. *Id.* at 1262-263.

In another case, Pennsylvania's intermediate appellate court affirmed a dismissal where the plaintiff could only demonstrate reputational harm. *Pelagatti v. Cohen*, 370 Pa. Super. 422, 435-36, 536 A.2d 1337 (1987). As the *Pelagatti* court aptly observed: "In the absence of pecuniary loss, an action for interference with contract brought for the purpose of recouping damages for loss of reputation only, would be nothing more than a defamation action under a different caption." *Pelagatti*, 370 Pa. Super. at 436.

In Massachusetts, an appellate court reversed a jury verdict in favor of the plaintiff under this tort and ordered entry of judgment in favor of the defendant. *Ratner v. Noble*, 35 Mass. App. Ct. 137, 617 N.E.2d 649 (1993). The appellate court reversed the verdict because there had been no evidence of pecuniary loss. *Id.* at 138-39. The plaintiff apparently only suffered reputational and possibly some emotional harm. *Id.* at 138.

In the absence of any pecuniary loss, we hold that Dr. Tamosaitis's emotional harm and speculative reputational harm are not recoverable under this tort. Recognizing this difficulty, Dr. Tamosaitis claims that the loss of his books and personal effects should satisfy the element of pecuniary loss. While these belongings are of obvious pecuniary value, their loss lacks any causal relation to the elements of this tort.

"[T]he essence of the tort is damage to a business relationship or contemplated contract of economic benefit." *Ratner*, 35 Mass. App. Ct. at 138; *Restatement* § 766B. Dr. Tamosaitis's cause of action is for harm to his employment relationship with URS. Dr. Tamosaitis's books have no relationship to the conditions of his employment. While these two losses arose out of a common nucleus of facts, they are separate and distinct. Dr. Tamosaitis could have stated a replevin or conversion claim against Bechtel in his same complaint, but it does not mean that he can merge two distinct torts into one. *See* CR 18; *Murphy v. Prosser*, 96 Wash. 499, 501, 165 P. 390 (1917).

12

Having not established that he suffered pecuniary losses from the reassignment,

Dr. Tamosaitis's action against Bechtel necessarily failed. Accordingly, we affirm the

lower court's grant of summary judgment for the defendants.

*Record Arguments*

Before reaching the merits of the CR 60 issue, we must first resolve Dr.

Tamosaitis's motion to supplement the record with evidence of his termination and

Bechtel's corresponding motion to strike his brief.

We deny Dr. Tamosaitis's motion to supplement due to his failure to comply with

the Rules of Appellate Procedure. Dr. Tamosaitis brought his motion in the body of his

brief. The only motion that a party can make in the body of their brief is a dispositive

motion or a motion for attorney fees. RAP 10.4(d); RAP 18.1(b). A motion to

supplement the record under RAP 9.11 is nondispositive.

Dr. Tamosaitis also asks this court to take judicial notice of these same facts under

ER 201. However, a motion to take judicial notice under ER 201 is nondispositive, and

is still an attempt to supplement the record, which requires compliance with RAP 9.11

and 10.4(d).

Because Dr. Tamosaitis extensively cited to these inadmissible documents in his

second reply brief, Bechtel asks this court to strike his reply brief. Striking the reply brief

would further delay the appeal by requiring us to give Dr. Tamosaitis leave to fix his

reply brief; we thus deny the motion to strike. RAP 10.7. Instead, we will simply ignore

the offending portions of the reply brief. *Becerra v. Expert Janitorial, LLC*, 176 Wn. App. 694, 730, 309 P.3d 711 (2013) ("We deny the motion to strike. This court is aware of what is properly before us and what is not. We have not considered material that is not properly before us in deciding this case."),[3] *review granted*, 179 Wn.2d 1014, 318 P.3d 279 (2014).

Accordingly, the motion to supplement and the motion to strike are both denied.

*CR 60(b)*

We conclude that the superior court did not err when it refused to vacate its summary judgment order. We review a trial court's ruling under CR 60(b) for an abuse of discretion. *Showalter v. Wild Oats*, 124 Wn. App. 506, 510, 101 P.3d 867 (2004). Discretion is abused if it is exercised without tenable grounds or reasons. *State ex rel. Carroll v. Junker*, 79 Wn.2d 12, 26, 482 P.2d 775 (1971).

Here, Dr. Tamosaitis sought relief under CR 60 by claiming that he had new evidence of damages. To support his motion, he provided this court with documents showing that he had lost his incentive pay and that URS would not consider him for any other positions at the WTP. Rather than bringing his motion under CR 60(b)(3), the provision expressly reserved for newly discovered evidence, he brought his motion under

---

[3] Even if we were to consider the evidence of Dr. Tamosaitis's termination, we would reach the same result because this after-occurring evidence could not have affected the trial court's ruling that is under review.

CR 60(b)(11), a catchall provision.

Dr. Tamosaitis took this tact because motions under (b)(3) can only be brought within one year of the entry of judgment. CR 60(b). However, "[t]he use of CR 60(b)(11) should be confined to situations involving extraordinary circumstances not covered by any other section of the rule." *In re Marriage of Yearout*, 41 Wn. App. 897, 902, 707 P.2d 1367 (1985) (internal quotation marks omitted). In other cases where parties have tried to use CR 60(b)(11) to skirt the one year limit on motions brought under CR 60(b)(1)-(3), this court has soundly rejected those attempts as violating the spirit of the rule. *Friebe v. Supancheck*, 98 Wn. App. 260, 267, 992 P.2d 1014 (1999); *Bergren v. Adams Cnty.*, 8 Wn. App. 853, 857, 509 P.2d 661 (1973). We agree with those cases and hold that the superior court did not abuse its discretion by denying Dr. Tamosaitis's CR 60 motion.

Dr. Tamosaitis tries to distinguish these decisions by speculating—without any supporting evidence—that Bechtel manipulated the timing of URS's bonus decision to come just after the CR 60(b)(3) one year time limit. That, however, presents another problem of causation. Dr. Tamosaitis has no new evidence showing that any person or entity other than URS had any part in these new adverse actions. But, even assuming that Dr. Tamosaitis had prima facie evidence establishing a causal link through URS to

Bechtel, the trial court still did not err in refusing to grant the motion. CR 60 relief will not be granted when the new evidence is a change in facts that had not yet

15

No. 31451-1-III; No. 31789-7-III
*Tamositis v. Bechtel Nat'l*

occurred at the time judgment was entered. *State v. Dorosky*, 28 Wn. App. 128, 133, 622 P.2d 402 (1981). Stated differently, newly occurring evidence is not the same as newly discovered evidence for purposes of CR 60. Accordingly, the trial court did not abuse its discretion in denying the motion.

Affirmed.

_____
Korsmo, J.

WE CONCUR:

_____
Siddoway C. J.

_____
Knodell, J.P.T.

16