[No. 15478-5-III.    Division Three.    December 23, 1997.]

THE STATE OF WASHINGTON, *Appellant*, v. THE
WANDERMERE COMPANY, ET AL., *Respondents*.

*Christine O. Gregoire, Attorney General*, and *Bryce E. Brown, Jr.*, and *Robert A. Wright, Assistants*, for appellant.

*William D. Symmes* and *Timothy M. Lawlor* of *Witherspoon, Kelley, Davenport & Toole, P.S.*; and *Robert A. Dunn* and *Deborah J. Good* of *McCormick Dunn & Black, P.S.*, for respondents.

SWEENEY, C.J. — This is a condemnation case. The State's theory of the case would have limited its taking to a 24.45-acre parcel of property, owned by The Wandermere Company and leased to Acme Concrete Company as a sand and gravel pit. Wandermere's theory of the case expanded the State's taking to a 62-acre parcel that included not only the 24.45-acre parcel actually mined by Acme but also an additional 37 acres which contained sand and gravel deposits but had not been mined. The jury accepted Wandermere's theory of the case. The question presented is whether its evidence was legally sufficient to submit Wandermere's theory of the case to the jury. Or, said another way, whether the trial court should have ruled as a matter of law that the taking was limited to the 24.45 acres and the jury's award for the additional 37 acres represented, as a matter of law, an improper payment for a future intended use. *See Doolittle v. City of Everett*, 114 Wn.2d 88, 786 P.2d 253 (1990). We agree with the trial court. There was sufficient evidence of a unified and current use of the 62-acre parcel to submit Wandermere's theory to the jury. We therefore affirm the judgment.

## FACTS

Evidence

In 1993, the State of Washington condemned 5.56 acres owned by The Wandermere Company as part of a highway construction project. Wandermere leased 24.45 acres, which included the condemned property, to Acme Concrete Company for a sand and gravel pit. Acme had mined the site as recently as 1988. Buildings and equipment used for the operation were located on the 5.56 acres.

The State offered $38,900 for the taking. The State's offer was premised on its theory that the condemned 5.56 acres was part of the 24.45-acre leased parcel that contained

little remaining sand and gravel deposits. Hence, its highest and best use was not as a mine, but for residential purposes. Wandermere and Acme maintained that the taking was from part of a larger 62-acre parcel that contained 4.5 million cubic yards of sand and gravel yet to be mined.

The State presented evidence that only the 24.45-acre leasehold was appropriately zoned for mining operations or covered by a state mining permit. The additional 37 acres was zoned for single family dwellings. An engineer called by the State also concluded that the 37 acres contained little sand and gravel. An appraiser hired by the State concluded that the highest and best use for the 5.56 condemned acres was residential and valued the property at between $9,000 and $12,000 per acre.

Robert Ross and Herbert Brown are members of the family that owns Wandermere. They testified that the gravel pit had been in use since the 1920s. The family regarded the entire 62 acres as a single unit and expected to mine all of it. When Acme's predecessor wanted to lease the property in 1977, Wandermere limited the lease to 24.45 acres because it did not want to commit the entire parcel to one lessee. Acme's officers and employees testified that in 1987 the company explored extending the lease to the additional 37 acres. Acme's expert estimated that the 37 acres contained about 4.5 million cubic yards of sand and gravel suitable for construction. He also testified that approximately 500,000 cubic yards of sand and gravel remained in the original 24.45-acre site. Acme claimed that it did not pursue the expanded lease because new construction slowed and consequently so did the demand for sand and gravel. It closed the mine. Construction increased in the early 1990s, but by that time Acme was aware of the State's intent to condemn the property for highway construction.

A Department of Natural Resources (DNR) employee, William Lingley, testified that Frederick Hobbs of Acme contacted him in 1987 to inquire about expanding the mining permit to cover the additional 37 acres. Mr. Lingley testified that the DNR probably would have granted the

extension because of the high demand for sand and gravel and a Growth Management Act preference for expansion of existing mines over granting permits for new mines.

Dwight Hume, a land use planning consultant and former zoning adjuster, also testified that the highest and best use of the 37 acres was mining. He concluded that Wandermere could have obtained the necessary zoning change because mining was not a unique or new land use in the area. The owner had mined the adjoining 24.45 acres since the 1920s. Wandermere was the landowner and the closest neighbor to the proposed new zone. The steep sides of the 37 acres provide a natural buffer for the mine. Trucks transporting the sand and gravel had direct access to State Route 395. There were no severe environmental consequences that would follow the proposed extension. And, the Growth Management Act favored mining out existing sites.

Perry Michael Taylor is an expert in the design and construction of concrete batch plants and facilities for aggregate crushing, sorting and sizing. He evaluated the ground that would be left after the State's taking and concluded only 1.36 acres would be available to locate a batch plant—substantially less than would be needed. Most of the remaining site was either too steep or too unstable for building. The State presented expert opinions that the remaining site was suitable for building.

Steve Robinson, Acme's president, testified the Wandermere plant had a special value to Acme because it was located in the high growth areas of north Spokane and Spokane County. This location reduced the cost of transporting the product, which gave Acme a competitive edge. He testified Acme always intended to reopen the mine and continued to pay the annual rental of $10,000 per month, even after it closed the mine in 1988. It also continued to pay the additional annual minimum royalty payment of $12,500. Under the lease, Acme paid Wandermere a royalty of $1 for every cubic yard mined. Mr. Robinson testified that when Acme heard reports that the State intended to condemn the property for a road project, it moved its batch plant and equipment.

Dewitt Sherwood also testified the highest and best use of the larger parcel was mining. Mr. Sherwood concluded the taking had eliminated the highest and best use for the 62-acre parcel. He based his opinion on testimony that the remaining acreage had no suitable site for the batch plant. He used the income approach to measure the loss. Mr. Sherwood testified the fair market rental value of the property at the time of the taking was $20,000 per month. And Wandermere would have collected $4.5 million in royalty payments had mining continued. Mr. Sherwood viewed all royalty amounts as rent. He assumed a lessee would mine all 4.5 million cubic yards of the sand and gravel remaining on the 37 acres in the next 10 years, and ultimately pay Wandermere royalties of $4.5 million. To this sum, he added the monthly rental payments for 10 years, discounted both the royalties and the monthly rent amounts to present value, and subtracted the reversionary value of the property after the mine was depleted. Based on these calculations, Mr. Sherwood estimated the value of the acreage, if used as a sand-and-gravel mine, was $4,580,000.

Appraiser Stanley Moe testified on rebuttal that the royalty amount used by Mr. Sherwood was not proper for a valuation using the income approach. According to Mr. Moe, a royalty may be rent and/or payment for depletion of a resource. In this particular case, Mr. Moe viewed the minimum annual $12,500 royalty payment as rent. He believed future royalty payments in excess of that amount were too uncertain to be included in a valuation based upon the income approach. Specifically, the lease did not require the lessee to remove any amount of sand and gravel each year, let alone 450,000 cubic yards per year for 10 years—the basis for Mr. Sherwood's valuation.

Both sides moved for directed verdicts. The State argued that the parcel, which was the subject of its taking, consisted of the leased 24.45 acres. Acme and Wandermere argued that the relevant parcel consisted of the entire 62 acres. The court denied both motions and submitted the case to the jury.

Instructions

The court instructed the jury that

[e]vidence has been introduced in regard to which property should be considered for the purpose of determining just compensation. For purposes of making this determination, you are instructed that the property is defined as all parcels which *are unified by ownership and use* . . . .

(Emphasis added.)

The State objected. It proposed an instruction that "[i]n order to find unity of use you must find that the parcels are *presently used* in connection with each other for the *same use*." (Emphasis added.) It also unsuccessfully proposed "Instruction No. 6":

The following are *not* required elements nor criteria for the larger parcel test: legal divisions, such as those created by platting; the intent of the owner; the adaptability of the property; the dependence between parcels; the "highest and best use" of the property; zoning; the appearance of the land; and the possibility of tracts being used in combination in the reasonably near future.

(Emphasis added.)

The court defined "just compensation" as the difference in value before and after the taking, and "fair market value" as the price a willing buyer and a well-informed seller would agree upon for the property. It also instructed the jury that it should not consider "anything which is remote, imaginary, or speculative, even though mentioned or testified to by witnesses." Further, proper considerations are those "which will actually affect the fair market value of the property . . . ."

The trial court refused to give the State's proposed instruction 7 relating to valuing the property. The proposed instruction would have told the jury not to consider the value of the sand and gravel, if mined. The instruction read:

In valuing land which contains minerals such *minerals must be valued in place*; that is, the measure of compensation is the

sum that would be given for the land with the minerals in it. Any inquiry as to the price or value of such minerals as if the minerals have been taken out, is not permitted.

*Royalties may be considered* by you *only* in so far *as they assist* you *in arriving at the value of the land with the material in it.*

*You may not*, however, *multiply the number of yards of minerals* in place *by a price or value* to arrive at the fair market value of the land with the minerals in it.

(Emphasis added.)

The State also unsuccessfully proposed a mitigation instruction:

You are instructed that the Wandermere Company and Acme Materials and Construction Company have an affirmative duty to take every reasonable means at reasonable expense to reduce or avoid any damages that may result in their property in the after situation. You may consider this duty in arriving at your verdict of just compensation.

During deliberations, the jury asked the court to "please define use." The court consulted with counsel. The State wanted the court to tell the jury "use" meant "actual use." Wandermere and Acme opposed that suggestion. Ultimately, the court told the jury to "reread all of the instructions."

Verdict and Posttrial

The jury returned a verdict of $3,500,000. The State moved for a new trial because the court failed to define "use." In support, it submitted the affidavits of two jurors to the effect the jury was confused on whether the unity of use requirement meant "actual use" or "intended future" use. The court denied the motion for new trial. The State appeals.

## DISCUSSION

The State contends the trial court erred in refusing to hold as a matter of law that the 24.45 acres and the 37 acres were two separate parcels for the purpose of valuing

the taking. It also contends that the trial court erroneously refused its proposed instructions that the larger parcel theory required present and actual unity of use, and that the future intended use of Wandermere's 37 acres was irrelevant.

Condemnation

An owner of real property has the right to a judicial determination of just compensation before the government takes his or her property. Const. art. I, § 16 (amend. 9). The State is obligated to pay when it condemns whole or part of a parcel of land. It is not obligated to compensate for injury to other separate and independent parcels owned by the condemnee, even if the taking results in damage to those separate and independent parcels. *State v. McDonald*, 98 Wn.2d 521, 525, 656 P.2d 1043 (1983) (citing 4A JULIUS L. SACKMAN, NICHOLS ON EMINENT DOMAIN § 14.25 (3d rev. ed. 1981)).

Where a single parcel of land is taken, "the measure of damages is the fair market value of the land taken together with damages to the [remaining portion]." *McDonald*, 98 Wn.2d at 525-26. Thus, if the State condemns one portion of a larger parcel of property and the effect is to reduce the value of the larger parcel, the owner may recover for damage for the reduction in value of the larger parcel. *Doolittle v. City of Everett*, 114 Wn.2d 88, 96, 786 P.2d 253 (1990).

The larger parcel test requires that the landowner establish that the parcel being condemned is part of a single tract. The test has three elements: unity of ownership, unity of use, and contiguity. *State v. Lacey*, 8 Wn. App. 542, 546, 507 P.2d 1206 (1973). Significantly, for our discussion, the determination is for the jury unless reasonable minds could not differ. *McDonald*, 98 Wn.2d at 526; *Lacey*, 8 Wn. App. at 546.

Larger Parcel Analysis

Sufficiency of Evidence. With this brief statement of

the law of eminent domain, we now turn to the facts of this case. The State relies on *Doolittle* for its argument that the unity of use element is limited to the present and same use. Wandermere's use of the 37 acres, it claims, was neither present nor was it the same.

*Doolittle* addressed whether the city, in levying taxes for a street improvement, properly treated four lots as a single parcel. The assessor testified that the highest and best use of the four lots would be as a planned retail/commercial shopping complex. A single commercial building occupied three of the lots at the time of the tax assessment. The fourth lot was used separately. The owner protested that the fourth lot was not benefited by the street improvement because very little of it abutted the street being improved. *Doolittle*, 114 Wn.2d at 91-93.

*Doolittle* first recognized that the source of the "larger parcel test" is eminent domain law. The court nonetheless found it helpful in deciding whether the lots should be combined into one tract for tax purposes. *Id.* at 96. After reviewing cases from other jurisdictions, the court concluded that the better approach did not consider possible future integrated use. *Id.* at 100. It relied on *Lacey* and several other cases[1] for its conclusion that platted lots not presently put to a unified use do not constitute a single tract. *Id.* at 101-02. And the fact that they may be used together in the future does not show current unity of use. *Id.* at 104-05.

Wandermere and Acme try to distinguish *Doolittle* because *Doolittle* is a tax, not an eminent domain, case. *Doolittle* admits the distinction but holds it is immaterial. We agree and conclude *Doolittle*'s holding applies in eminent domain cases: Parcels must have a present unified use before they are part of a single, larger parcel for condemnation purposes. *Doolittle*, 114 Wn.2d at 101-04.

---

[1]*City of Seattle v. Dexter Horton Trust & Sav. Bank*, 90 Wash. 661, 156 P. 844 (1916), *overruled on other grounds by In re City of Seattle*, 115 Wash. 535, 197 P. 784 (1921); *In re Queen Anne Boulevard*, 77 Wash. 91, 137 P. 435 (1913); *Wilcox v. St. Paul & N. Pac. Ry.*, 35 Minn. 439, 29 N.W. 148 (1886).

The question then is whether Wandermere and Acme presented sufficient evidence of the current use of the full 62 acres as a sand and gravel pit to submit the case to the jury. This record supports that they did. We will again review, briefly, evidence presented by Wandermere and Acme that supports their position, evidence that was apparently accepted by the jury.

Acme officers and employees testified that in 1987, Acme wanted to expand its lease to the additional 37 acres. Frederick Hobbs estimated the 37 acres contain about 4.5 million cubic yards of sand and gravel suitable for construction purposes. He also testified the original 24.45-acre site has approximately 500,000 cubic yards of sand and gravel remaining on it. William Lingley testified Mr. Hobbs called him in 1987 to discuss expanding the mining permit to cover the additional 37 acres. Mr. Lingley said DNR probably would have granted the extension. Dwight Hume testified the highest and best use of the 37 acres was mining. He thought Wandermere could have obtained a zoning change. Finally, Wandermere's owners testified they always regarded the property as a single unit and expected to mine all of it.

■■ Evidence is sufficient to withstand a motion for directed verdict if, when viewed in the light most favorable to the nonmoving party, it would sustain a verdict in that party's favor. *Stiley v. Block*, 130 Wn.2d 486, 504-05, 925 P.2d 194 (1996). We do not weigh the evidence. The evidence here was sufficient to submit the "larger parcel" theory to the jury.

Instructions

The court refused the State's request to define use as "present use" and "the same use." The question here is not whether the State's instructions were an accurate statement of the law. They may well have been. The question rather is whether the State had the opportunity to argue its theory of the case with the court's instructions. *Havens v. C&D Plastics, Inc.*, 124 Wn.2d 158, 165, 876 P.2d 435 (1994). We conclude it could.

The court instructed the jury that "the property [to be considered for purposes of determining just compensation] is defined as all parcels which are unified by ownership and use . . . ." The instruction uses the present tense of the verb—"are." A fair reading of the instruction—one argued by the State—is that use means present use. The State argued to the jury: "[U]se means . . . actual use . . . it doesn't say future use . . . ." Just as significantly, Wandermere's attorney did not argue that use meant future use. He told the jury: "They've [Wandermere] held this 37 acres in reserve." Acme's attorney followed in the same vein: "[C]ommon sense is gonna to tell you that this is a mining operation and we're not just talking about 24 acres, we're talking about the 62 acre parcel."

The verdict is consistent with a finding of present use of the 37 acres as a mine. Unlike *Doolittle*, the 37-acre parcel at issue here was not separately platted, nor was it presently used for some purpose other than mining. Mr. Ross anticipated the actual mining of the property would move eastward from the 24.45-acre parcel (a parcel concededly impacted by the condemnation) into the 37 acres, after the 24.45 acres was depleted of its reserves. The court's instruction on use accurately stated the law and gave each side an opportunity to argue its theory of the case. *Havens*, 124 Wn.2d at 165. The trial court did not abuse its discretion in refusing to instruct on an expression of common understanding—here "use." *State v. Brown*, 132 Wn.2d 529, 611-12, 940 P.2d 546 (1997).

The State next argues the court erred in refusing to instruct the jury that certain facts, including the property's highest and best use, are *not* proper considerations in the larger parcel test.[2] The State's proposed instruction is the opposite of an instruction given in a Florida case, *Division*

---

[2]"The following are not required elements nor criteria for the larger parcel test: legal divisions, such as those created by platting; the intent of the owner; the adaptability of the property; the dependence between parcels; the 'highest and best use' of the property; zoning; the appearance of the land; and the possibility of tracts being used in combination in the reasonably near future." State's Proposed Instruction 6.

*of Admin., State Dep't of Transp. v. Jirik*,[3] cited in *Doolittle*, 114 Wn.2d at 98. Because *Doolittle* held that unity of use requires unity of present use, the State infers that it rejected the other factors listed in the *Jirik* case. Even if that is true, however, it would not require the State's proposed instruction to that effect. Again, the court's instruction permitted the State to argue valuation based on current ownership and use.

The State also argues its proposed instruction was needed because evidence presented by Wandermere and Acme focused on such factors as "highest and best use." This argument misses the point. That evidence was admitted on the valuation issue, not the unity of use question. *Doolittle*, 114 Wn.2d at 99 (that highest and best use relevant to value). Once the jury determined the 37 acres was part of the larger parcel, then evidence of the highest and best use of that parcel was relevant to the issue of damages caused by the taking.

In summary, we hold the court properly submitted to the jury the question of whether the 24.45 acres was part of a larger 62-acre parcel and had a unified use as a sand and gravel mine. Its instructions adequately and accurately informed the jury of the law and permitted both parties to argue their theories.

Jury's Request for Definition of Use

The State argues the court should have further instructed the jury on the definition of use when the jury, during deliberations, requested it to do so.

The decision whether to give additional instructions requested by the jury during deliberations is discretionary with the trial court. *State v. Ng*, 110 Wn.2d 32, 42, 750 P.2d 632 (1988). As we have already discussed, the word "use" is a commonly understood term. It was not error therefore for the court to refuse further instructions. *See Brown*, 132 Wn.2d at 611-12.

---

[3]471 So. 2d 549 (Fla. Dist. Ct. App. 1985), *approved*, 498 So. 2d 1253 (Fla. 1986).

■ The jurors' affidavits outlining their thought processes and difficulty in arriving at the verdict clearly "inhere in the verdict" and cannot be used to impeach it. *Ayers v. Johnson & Johnson Baby Prods. Co.*, 117 Wn.2d 747, 768, 818 P.2d 1337 (1991).

Valuation

The State next maintains the court should have given its proposed instruction on valuation. That instruction specifically would have advised the jury not to consider the price or value of the minerals, as if they had been mined, or the royalties, except as an indication of market value.

■ During the trial, Dewitt Sherwood calculated the value of the anticipated royalties. To this he added monthly rental payments for 10 years. He then discounted both the royalties and monthly rent amounts back to present value, and subtracted the reversionary value of the property after the mine had been depleted. The State did not object to his testimony. And his testimony was properly admitted. In *Seattle & Mont. R.R. v. Roeder*, 30 Wash. 244, 265, 70 P. 498 (1902), the court held: "[T]he quantity of stone that could be gotten from the land, and the value thereof, *or the royalty thereon*, are proper to be considered by the jury as a guide in determining the market value of the land." (Emphasis added.) *See also State v. Mottman Mercantile Co.*, 51 Wn.2d 722, 725, 321 P.2d 912 (1958) (while minerals are not to be separately evaluated, " 'consideration may be given to the quantity of the mineral that can be extracted and to the value thereof *purely as evidence for arriving at the value of the land*.' 4 Nichols Eminent Domain (3d ed.) 245, § 13.22[1].") (emphasis added); *State v. Hobart*, 5 Wn. App. 469, 471, 487 P.2d 635 (1971) (evidence of unit value of gravel in its natural state is admissible as a factor in determining overall market value). The rationale is that "no one would either buy or sell a gravel pit without having some idea of the amount of gravel available, and its value in its natural condition . . . ." *Mottman*, 51 Wn.2d at 724.

While the court's instructions advised the jury not to consider anything remote or speculative in determining value, the State contends a more specific instruction not to consider royalties except as a guide to fixing the property's fair market value was necessary. But such an instruction would have emphasized the State's theory of the case. Amplified instructions generally are not required if the instructions given are broad enough to permit each party to argue its theory. *State v. Elder*, 70 Wn.2d 414, 419, 423 P.2d 533 (1967). Here, the State was able to argue in closing that Mr. Sherwood's valuation testimony, insofar as it was based on royalty amounts, related to future profits, not present fair market value.

The State suggests that even though testimony about royalties is relevant and admissible, it must be accompanied by a cautionary instruction. It relies on two Washington decisions in which a variation of the proposed instruction was given. *See Elder*, 70 Wn.2d at 416; *Seattle & Mont. R.R.*, 30 Wash. at 261. Neither case requires an instruction when there is evidence of royalties.

The State's next claimed error is to the court's refusal to instruct the jury not to determine fair market value by multiplying the amount of the sand and gravel on the property by a unit price. It cites the "sound general rule . . . that it is improper to arrive at a conclusion concerning the value of property which has a mineral content by multiplying the assumed number of cubic yards of material available times a given price per unit." *Mottman*, 51 Wn.2d at 724. Again, the instructions, as given, were sufficient for the State to argue that the determination of market value required the jury to consider several factors, and that a simplistic process such as that just described could not by itself support such a determination. There is no authority that requires the court to affirmatively instruct the jury *not* to reach a verdict by multiplying the $1 royalty price by the number of cubic yards of sand and gravel in place.

The State cites the affidavit of juror Douglas Demmert that "[i]t was . . . clear that several of the jurors merely

considered the quantity of materials in the 37 acres multiplied by a royalty of one dollar per yard, without any discount, even for time." But, Mr. Demmert's affidavit states only his opinion on how the other jurors arrived at the verdict. He suggests that some of the jurors originally wanted to award Wandermere and Acme $4.5 million, an amount that equals the product obtained when multiplying the 4.5 million cubic yards of material remaining by the $1 per cubic yard royalty called for in the lease. However, the verdict was $3.5 million, not $4.5 million.

Duty to Mitigate

Other jurisdictions have approved the concept of mitigation of damages in eminent domain cases. *See State v. Weiswasser*, 149 N.J. 320, 693 A.2d 864, 869 (1997) (and cases cited therein). We, however, cannot find a reported decision in which the refusal to give a mitigation instruction was prejudicial error. In any event, other instructions given by the court here permitted the State to argue its theory that Wandermere and Acme could have mitigated their damages. Specifically, the court told the jury Wandermere and Acme were entitled to just compensation for the taking, defined as the difference in the value of the property before and after the taking. If the jury accepted the State's theory that the batch plant could have been relocated on the remaining property, it would not have set the value of the taking at $3,500,000.

The judgment of the trial court is affirmed. Wandermere and Acme are entitled to attorney fees on appeal. RCW 8.25.070(1)(b); RAP 18.1(a), (f).

KURTZ and BROWN, JJ., concur.

Review denied at 135 Wn.2d 1012 (1998).