IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| CENTRAL PUGET SOUND REGIONAL TRANSIT AUTHORITY, a regional transit authority, dba SOUND TRANSIT,<br><br>     Respondent,<br><br>  v.<br><br>LEONARD S. & KARI C. MARINO (EL169 & 13 EL806), individually and the marital community composed thereof,[†]<br><br>     Defendants,<br><br>IRIS GUY & JANE/JOHN DOE GUY (EL638), individually and the marital community composed thereof; MARK S. & REGINA C. HANLON (EL666), individually and the marital community composed thereof; ADAM SHAFER & HOLLY HART-SHAFER (EL679), individually and the marital community composed thereof; SUNG GON MAENG & JINSUN BAE (EL739), individually and the marital community composed thereof; CHRISTOPHER SMITH & LEAH ANDERSON (EL776), individually and the marital community composed thereof; DAVID K. & NATIVIDAD M. SOIKE (EL778), individually and the marital community composed thereof; MARTIN W. & HEATHER H. YAMAMOTO (EL874), individually and the marital community composed thereof; and OLGA RUZAEVA and JANE/JOHN DOE RUZAEVA (EL875), individually and the marital community composed thereof,<br><br>     Appellants. | No. 82426-1-I<br><br>DIVISION ONE<br><br>UNPUBLISHED OPINION |

---

[†] See Appendix for a list of all Defendants.

Citations and pin cites are based on the Westlaw online version of the cited material.

SMITH, A.C.J. —Central Puget Sound Regional Transit (Sound Transit), seeking to construct a light rail station, purchased property in Bellevue's Surrey Downs neighborhood. This property was encumbered by "Covenants, Conditions, and Restrictions" (CC&Rs) prohibiting Sound Transit's intended use, and the agency therefore began a condemnation action to remove those restrictions. Before the case went to trial, Sound Transit acquired the votes it needed to amend the CC&Rs and dismissed the case. Its dismissal was vacated after a collection of owners argued that the agency had abandoned the case and they were owed fees and costs as a result. The matter then proceeded to trial under two theories of liability: that Sound Transit committed a taking by engaging in construction activities on its property before amending the CC&Rs, and that it committed a taking by denying the owners their ability to enforce the CC&Rs. A jury awarded the owners $1,000 each.

On appeal, the owners contest a number of rulings by the trial court. Finding no merit to their arguments, we affirm.

## FACTS

### Sound Transit Initiates Condemnation Action

The Surrey Downs neighborhood comprises four plats, subdivisions that include multiple properties: Hearthstone Addition Part No. 1, Hearthstone Addition Part No. 2, Surrey Downs Addition No. 1, and Surrey Downs Addition No. 2. Each of these plats is governed by certain CC&Rs. Each CC&R, among other restrictions, limits its constituent properties to residential use.

Sound Transit initiated this proceeding in April 2016 when it filed an eminent domain petition to amend the CC&Rs.[1] The CC&Rs' residential use restrictions blocked Sound Transit's intended use of land it had purchased at the edge of the neighborhood: construction of a light rail station. Sound Transit's goal in filing the petition was to remove the residential use restrictions as they applied to the property on which it planned construction. It therefore sought to "ascertain the just compensation for the taking and damaging" effected by the amendment of the covenants.

Some property owners—all located within the Surrey Downs No. 1 and Surrey Downs No. 2 plats—opposed the condemnation.[2] In a June 2017 summary judgment motion they asserted that even were Sound Transit to prevail, it would not have acquired the rights needed to operate the planned light rail station. They argued that private easements and noise and vibration restrictions of the CC&Rs were independent bars to the station's construction, and they requested compensation for these additional alleged takings. They did not prevail on their motion and their petition for discretionary review was denied.

Meanwhile, over the course of roughly two years following the petition's filing, Sound Transit had voluntarily dismissed many of the named respondents— of which there were initially close to two hundred—after reaching private agreements with them. It obtained property rights of other respondents by

---

[1] The action never addressed Hearthstone Addition Part No. 1's CC&R because Sound Transit had already acquired the ability to modify it.

[2] Sound Transit, appraising the change in value of the properties at $0, offered $300 in compensation per property.

default judgment and dismissed them as well. Through this process—and by virtue of its ownership of the properties it had purchased before filing the petition—Sound Transit acquired the rights and votes it needed to satisfy the amendment procedures of the various CC&Rs by early 2018.[3] The now amended CC&Rs read:

> The HCT Lots may be used for the purpose of allowing the construction, operation and maintenance of a high capacity transit ("HCT") system upon or adjacent to the HCT Lots and for the purpose of preserving the residential nature of the Property on portions of the HCT Lots available for such development after the HCT system is constructed.

> Except for the HCT purpose described above, the HCT Lots may only be used for residential purposes, and no permanent building may be erected other than a single family dwelling.

### Dismissal and Vacation

Having acquired the power to amend the CC&Rs independent of its condemnation action, Sound Transit moved to voluntarily dismiss the case. The motion passed without response from the remaining litigating property owners and was granted by the trial court.

The still-litigating owners then moved for attorney fees and costs under RCW 8.25.075(1)(b), which directs the court to award condemnees costs and fees if "[t]he proceeding is abandoned by the condemnor." The trial court concluded that the equities supported a theory of abandonment and reserved its decision on fees. Four days later, before the court had readdressed fees, Sound Transit moved to vacate the voluntary dismissal order. It argued that vacation

---

[3] The vote threshold needed varied by plat. Surry Downs Additions Nos. 1 and 2 needed 75 percent approval; Hearthstone Additions Nos. 1 and 2 needed only 50 percent.

would "cure[] the unintended consequences identified by the Court in the Abandonment Order," returning the parties to their respective positions prior to the dismissal. The trial court agreed and vacated the dismissal. The owners sought and were denied discretionary review of this ruling.

### Claims Brought to Trial

After the reinstatement of the case, a second set of cross-motions for summary judgment, a corresponding motion to clarify, and motions in limine refined the claims that would be argued at trial.

Sound Transit, having amended the CC&Rs, did not believe that trial was necessary. It moved for summary judgment, asking that the court enter an order determining that the respondents to the condemnation action no longer had compensable rights because " 'the property rights sought to be altered . . . [have] already been acquired.' "

The owners filed a cross-motion, pointing again to other, unamended provisions in the covenants to assert that the agency was still bound by certain restrictions. They specifically pointed to noise, dust, and vibration restrictions of the CC&Rs.[4] Here, the owners presented evidence that Sound Transit had

---

[4] The restrictions in Surrey Downs Additions Nos. 1 and 2's respective CC&Rs: "There shall be no noise, vibration, smoke, dust, odors, heat or glare produced as a result of the home occupation which would exceed that normally produced by a single family residence." And: "NUISANCES. No noxious or offensive activity shall be carried upon any lot, nor shall anything be done thereon which may be or may become an annoyance or nuisance to the neighborhood."

They also pointed to a provision from Surrey Downs Addition No. 1's CC&R: "Noise from heating or cooling units or other appliances or activities shall not represent a nuisance to the adjoining residential neighborhood and must

5

started construction *before* the CC&Rs were amended and asserted the agency had violated the CC&Rs' noise and dust restrictions in doing so.[5]

The trial court granted Sound Transit's motion in part, concluding that the amendments to the CC&Rs had extinguished most of the relevant rights. It permitted the owners' inverse condemnation claims surrounding noise and vibration to go forward to trial, however, because of the existence of genuine issues of material fact. It limited compensation to loss of valuation in property for the period of time until the taking was completed by the amendment of the CC&Rs. Finally, it noted that the order did not address whether the owners possessed any claims related to Sound Transit's actions after amending the CC&Rs.

The court revisited certain issues after the owners moved for clarification. It defined the relevant taking as "the de facto taking of [the owners'] right to enforce the CC&Rs on the Sound Transit owned Parcels . . . , a taking that occurred when Sound Transit's activities on the Parcels violated the CC&Rs." It confirmed that compensation would be decided by "the difference between the fair market value of each [owners]'s entire tract before the acquisition and the fair market value of the remainder after acquisition." And it ruled that the taking's valuation date would be determined before trial.

---

comply with the Maximum Environmental levels prescribed by Chapter 173-60 of the Washington Administrative Code as amended from time to time."

[5] This portion of the litigant owners' evidence supporting their summary judgment motion does not appear to have been included in the record on appeal. The cited characterization is Sound Transit's.

That order was not, however, the final word on these issues. At the hearings on motions in limine, the court said it had left some ambiguity as to exactly what the claims at trial were. It decided that in fact "there are two parts of damages allowed: The temporary taking, noise, nuisance, dust; and the final taking, the difference between the fair market value of Respondent's entire tract before acquisition and the fair market value of remainder after acquisition." For the temporary taking, the court ruled that the damages would be calculated as lost rental value. Surprised, Sound Transit noted that they had not disclosed relevant witnesses or exhibits. Acknowledging that the last-minute change in the theory of the case prejudiced the agency, the court continued trial by a week.

<u>Trial</u>

Trial proceeded in fits and starts, but began to face logistical complications in earnest once the owners began their case-in-chief. The court had ruled during motions in limine that the owners themselves could testify on the value of their homes. But it had strictly limited the content of that testimony to ensure it did not trespass into territory typically reserved for experts.

At the start of the owners' case-in-chief, they began to give testimony that defied these rulings. They justified their testimony as responsive to the newly-permitted testimony from Sound Transit's experts, meant to address the trial's expanded legal theories. In the face of that and other scheduling limitations, the trial court required further disclosure from the owners, postponed their testimony until January, after a break for the holidays, and imposed time limits. It decided

that the best use of the remaining December availability was the completion of already-disclosed testimony from the owners' expert witnesses.

Trial concluded with a verdict for the owners of $1,000 in damages per property.

ANALYSIS

Vacation of Dismissal

The owners assign error to a number of the trial court's decisions. We will address them in roughly chronological order. First: the owners challenge the trial court's vacation of Sound Transit's CR 41 voluntary dismissal. They ask this court to "remand[ ]. . . for a determination of attorneys fees, expert witness fees and costs." Because the trial court acted within the discretion afforded it and its vacation resolved the inequities resulting from the voluntary dismissal, we conclude that it did not err.

Civil Rule (CR) 60(b) permits a trial court to vacate a final judgment, order, or proceeding. It provides 10 specific bases for vacation and one catch-all provision. CR 60(b)(1)-(10); CR 60(b)(11) ("Any other reason justifying relief from the operation of the judgment."). Use of the catch-all provision " 'should be confined to situations involving extraordinary circumstances not covered by any other section of the rule.' " Tamosaitis v. Bechtel Nat., Inc., 182 Wn. App. 241, 254, 327 P.3d 1309 (2014) (quoting In re Marriage of Yearout, 41 Wn. App 897, 902, 707 P.2d 1367 (1985)). It is therefore not a tool of equity by which to supersede the prescriptions of other civil rules. See Tamosaitis, 182 Wn. App. at 254-55 (upholding denial of motion to vacate seeking to circumvent CR 60(b)'s

8

requirement that motion be brought within one year).  But equitable considerations do have a role to play in the application of CR 60.  See CR 1 ("[the rules] shall be construed and administered to secure the just, speedy, and inexpensive determination of every action").  See also Kohl v. Zemiller, 12 Wn. App. 370, 372, 529 P.2d 861 (1974) (referencing CR 1 to say that "[p]ragmatic considerations" are relevant to proper application of the rules).

Rulings on motions to vacate are reviewed for abuse of discretion.  In re Marriage of Shoemaker, 128 Wn.2d 116, 120-21, 904 P.2d 1150 (1995).  " 'A trial court abuses its discretion when its decision is manifestly unreasonable or exercised on untenable grounds or for untenable reasons.' "  State v. Arndt, 194 Wn.2d 784, 799, 453 P.3d 696 (2019) (quoting State v. Lord, 161 Wn.2d 276, 283-84, 165 P.3d 1251 (2007)).

Here, the trial court did not abuse its discretion by granting Sound Transit's motion to vacate.  It had ample reason to conclude that extraordinary circumstances were present, and its vacation of Sound Transit's voluntary dismissal addressed a number of the particular equitable concerns that gave rise to that extraordinary nature.  Some of these concerns were first raised by the owners themselves.  In their motion arguing Sound Transit had abandoned the action because of its voluntary dismissal, for instance, they referenced case law establishing that voluntary dismissal "leaves the parties as if the action had never been brought."  Wachovia SBA Lending, Inc. v. Kraft, 165 Wn.2d 481, 492, 200 P.3d 683 (2009).  They asserted both that the dismissal rendered null prior orders in the case and that dismissal where the statute of limitations had not run

did not constitute a final order. And, they contended, the combined impact of the nullification and lack of a final order deprived the litigants of their right to appeal under RAP 2.2, leaving them subject to the discretionary review process.

The court's vacation order addressed these concerns and additional issues raised by Sound Transit in its motion to vacate the voluntary dismissal. First, it ensured that already entered orders—in particular default judgments—would not be rendered null and void by the dismissal or have their continuing effect become the subject of further dispute. Second, it removed the need to re-litigate issues that had already received resolution; an onerous and expensive process for all involved. Finally, it addressed the owners' claims that they were prejudiced insofar as the lack of a final order denied them appellate rights.

The owners contend that CR 60(b)(11) does not support the court's vacation order because the circumstances were not extraordinary, reading "extraordinary" to encompass only activities that are wholly outside of the control of the party moving to vacate. By arguing that the circumstances here were not extraordinary as a matter of law, they seek to demonstrate that the court necessarily abused its discretion when granting the motion to vacate. See Pub. Util. Dist. No. 1 of Okanogan County v. Washington, 182 Wn.2d 519, 531, 342 P.3d 308 (2015) ("An error of law necessarily constitutes an abuse of discretion.").

In support of this proposition, they cite to State v. Gamble, which concluded that " 'extraordinary circumstances' are unusual circumstances that are not within control of the party." 168 Wn.2d 161, 169, 225 P.3d 973 (2010).

Gamble concerned an exception to criminal mandatory joinder rules that the court applied using standards analogous to CR 60(b)(11). 168 Wn.2d at 168. Its analysis focused exclusively on the impacts of appellate decisions that change the state of the law underlying the order sought to be vacated and focused on cases arising in that context. Gamble, 168 Wn.2d at 169-70.

Reading Gamble's language as the owners suggest would have the effect of prohibiting the vacation of any voluntary dismissal on the motion of the dismissing party, an impact well outside of the Supreme Court's consideration when it decided the case. In addition, the court in Gamble itself did not read its language above—"that are not within the control of the party"—as strictly as the owners suggest. Later in the opinion it suggested a broader standard: "As explained, the extraordinary circumstances required are unusual circumstances beyond the control of the State *and extraneous to the action of the court or that go to the regularity of its proceedings.*" Gamble, 168 Wn.2d at 175 (emphasis added). Gamble does not control.

We find no error.

### Before and After Valuation

The owners assign error to the trial court's ruling that the parties were limited to a "before and after" valuation approach when calculating compensation. We decline to rule on this issue because it is insufficiently briefed.

The owners assign error specifically to the trial court's order denying certain respondents' motion to clarify orders on summary judgment, issued in

11

response to their request that the court clarify its rulings on the second set of summary judgment motions.  They devote only a single paragraph of their opening brief to argument on this error, noting merely that Washington does not limit condemnation appraisals to before and after valuation.  The very case they cite for this proposition begins its discussion of condemnation valuation by noting that the before and after approach is "the general method" applied in condemnation cases.  State v. Paul Bunyan Rifle & Sportsman's Club, Inc., 132 Wn. App. 85, 91, 130 P.3d 414 (2006).  Moreover, their proposed valuations—before and after for the permanent taking, rental value for the temporary taking—were accepted by the trial court and presented to the jury.

We therefore decline to consider this assignment of error.  "Passing treatment of an issue . . . is insufficient to merit judicial consideration."  Palmer v. Jensen, 81 Wn. App. 148, 153, 913 P.2d 413 (1996).  The owners have not explained the trial court's asserted error other than to gesture towards the possibility that other valuation methods may have been appropriate, nor have they shown how any error was preserved.  This is not enough.

## Date of Valuation

The owners assign error to the trial court's determination that the valuation date of the permanent takings was the trial date: November 2, 2020.  We find no error: the trial court properly applied the general rule in inverse condemnation cases that the valuation be the date of trial and the owners did not demonstrate prejudice sufficient to change that rule's application.

When the state condemns property, that property's owner is "entitled to be put in the same position monetarily as [they] would have occupied had [their] property not been taken." Lange v. State, 86 Wn.2d 585, 589, 547 P.2d 282 (1976). Determination of the appropriate amount considers " 'equitable principles and . . . varies with the facts.' " Lange, 86 Wn.2d at 590 (alteration in original) (quoting State Rd. Dep't v. Chicone, 158 So. 2d 753, 756 (Fla. 1963)). The general rule, however, is that "the property is valued as of the date of the trial." Lange, 86 Wn.2d at 590-91. Deviation from that approach can occur where its application "would be unfair in light of the particular circumstances." Lange, 86 Wn.2d at 591. This principle applies to both condemnation and inverse condemnation[6] cases. See Brazil v. City of Auburn, 93 Wn.2d 484, 496-97, 610 P.2d 909 (1980) (applying rule in inverse condemnation action).

The court in Lange reversed the trial court's decision to set the valuation date at the start of trial because the taking itself had negatively affected the property's marketability before that date. 86 Wn.2d at 594-95. In contrast, the court in Port of Seattle v. Equitable Capital Group, Inc. declined to reverse a trial day valuation date because "[t]here was absolutely no contention that the property['s value] had deteriorated" before the date of trial. 127 Wn.2d 202, 216-17, 898 P.2d 275 (1995). There, the alternative suggested valuation date was earlier: the date on which title had passed. Equitable Capital, 127 Wn.2d at 216.

---

[6] While a condemnation action is brought by the state to effect a taking, inverse condemnation actions are brought by property owners seeking compensation for a de facto taking they allege has already occurred. The elements of inverse condemnation are discussed further below in the section on the burden of proof jury instruction.

Consistent in these cases is the proposition that the proponent of deviating from the general rule that the date of valuation is the date of trial must demonstrate that the rule's application would cause prejudice.

Discussion of the permanent taking's date of valuation in this case spanned a number of motions and arguments. The trial court deferred ruling on the valuation date issue in its order denying the owners' motion for clarification regarding the court's orders in the second set of cross motions for summary judgment.

Because the trial court had not yet distinguished between the temporary and permanent takings at issue, valuation date arguments in pre-trial briefing are not necessarily relevant. They nevertheless fail to demonstrate any prejudice. The parties addressed the issue in their trial briefs and the owners argued for a February 26, 2018 valuation date—the day Sound Transit amended the CC&Rs and effected any taking. Around the same time, in their motions in limine, the owners requested that "no evidence of valuation or facts should be presented to the court showing valuation or the circumstances of the neighborhood past" the date of the taking. Here they asserted prejudice: "[U]sing the trial date as the valuation date[] is inherently prejudicial to the Respondents as their property rights were extinguished/taken on February 26, 2018 and not November 2020." But beyond this bare statement they did not explain the origin of the claimed prejudice through reference to any independent fact or argument.

The trial court made this point at the hearings for motions in limine, to which counsel for the owners responded: "the problem that we have in valuing it

today is that the circumstances on the ground have changed. . . . [I]t's akin to spoliation of evidence." And also stated, "the passage of time of two years and eight months since the right was amended strikes me as prejudicial to our clients in that it's been two years and eight months, and we don't get the time value of the money that we should have had then." Unmoved, the court adhered to a trial day valuation date.

In a supplemental brief contesting that ruling, with the permanent and temporary takings theory of the case now established, the owners wrote:

> it is not logical to impose two valuation dates in this case, one for the temporary taking representing the period of time which Sound Transit used its properties in violation of the restrictive covenants and before they were amended, and a second one reflecting the value of the loss of the right to enforce the restrictive covenants [the permanent taking] some two years and ten months after the property owners actually lost the right to enforce them. Such a position places the interests of Sound Transit over that of the property owners which Washington Law does not support.

Once again, this argument goes no further than to assert that setting the permanent taking's valuation date at a time other than when the taking itself occurred inherently constitutes prejudice. It does not explain with any specificity *how* prejudice exists. The matter was not clarified at a subsequent hearing, where discussion indicated a shared uncertainty among the parties and the court regarding the valuation date issue, including whether argument was focused on the temporary taking or the permanent one. The court did not change its ruling, and the jury instructions ultimately reflected the February 26, 2018 valuation date.

The lack of clarity evident below continues in the arguments made on appeal. First, the owners specifically assign error to the court's rulings on this issue in motions in limine, rather than the court's instructions to the jury or its deferred summary judgment ruling. More substantively, they still fail to provide any explanation as to precisely how that later date prejudices them, saying only: "Sound Transit received an unjust enrichment of the free use of their property in violation of the Restrictions from the Spring of 2016 and 2017 through November 2020 (a period of over 4.5 years) at the expense of the Owners." But by focusing on Sound Transit's use of the property, this argument seems more concerned with the damages addressed by the *temporary* taking claim, which considered any compensation for the use of the properties before the CC&Rs were amended. Meanwhile, any use of the property after the date of amendment was not a taking considered by the jury. And the permanent taking itself did not concern Sound Transit's use of the land. Instead, it was meant to compensate the owners for any loss of value due to the loss of their right to enforce the CC&Rs.[7]

---

[7] The owners cite to RCW 8.04.092 for the proposition that "in cases where the condemning authority has obtained possession and use prior to trial, the date of possession and use is treated as the valuation date." But RCW 8.04.092 concerns the date of entry of an *order* granting the state "possession and use of the property," which does not exist in the present inverse condemnation case.

Sound Transit, which opposed the later taking date below,[8] contends that the owners invited any error but does not squarely address whether the ruling was correct.

Relying on Equitable Capital, we decline to find error. The facts here are extraordinarily similar: appellants challenge the trial court's decision to set the valuation date as the date of trial where the property right at issue had already changed hands, but do not demonstrate any resulting prejudice. Furthermore, the owners have never shown how an earlier valuation date would have changed valuation testimony and led to prejudice. In fact, it appears possible that they benefited from a later taking date. The owners' theory of loss as expounded by their expert at trial assumed that the value of the properties at issue experienced a suppressed rate of growth when compared to similar properties that hadn't suffered from the proximity of construction. Insofar as that was true and swayed the jury, a later valuation date meant higher damages because the compensable difference in value between properties in Surrey Downs and elsewhere was more substantial as time went on.

Lange and Equitable Capital indicate that deviation from the general rule that the valuation date is the date of trial can occur where unfairness would result. Absent a showing of unfairness, the trial court may apply the general rule. We find no error.

---

[8] Largely on the basis that it did not think that trial could proceed on both the temporary *and* the permanent taking claims.

Testimony of Bates McKee

The owners next contend that the trial court erred when it allowed Sound Transit's appraisal expert, Bates McKee, to testify. We conclude that the trial court did not err.

Burnet v. Spokane Ambulance guides consideration of when a witness's exclusion is the appropriate remedy for a discovery order violation. 131 Wn.2d 484, 494, 933 P.2d 1036 (1997). The trial court has broad authority in its choice of sanctions, and its decisions in this arena are reviewed for abuse of discretion. Burnet, 131 Wn.2d at 494. Where greater sanctions are imposed, greater scrutiny is applied. Burnet, 131 Wn.2d at 494. The trial court must explicitly consider three factors: (1) whether the disobedient party willfully violated a discovery order; (2) whether the disobedience prejudiced the opponent's ability to prepare for trial; and (3) whether a lesser sanction would suffice. Burnet, 131 Wn.2d at 494.

A lengthy discovery history led to the owners' attempts to exclude McKee, Sound Transit's real estate appraiser. Sound Transit disclosed McKee's appraisal of the impact of condemnation on the properties in Surrey Downs in November 2017. It made the decision to withdraw him as a testifying witness in January 2018, after amending the CC&Rs, but reversed this decision quickly, re-designating him only a month later—just before the discovery cutoff—in response to the trial court's order on the owners' motion to clarify. Sound Transit reported that he would address damage or special benefits that might accrue to the properties as a result of the light rail construction. His valuation appraisals were

18

provided to the owners in early March 2020. The owners did not depose him at that time, a decision Sound Transit asserts was tactical, instead waiting until September 2020, shortly before the start of trial, to request a deposition. Sound Transit refused.

In response, the owners subpoenaed Sound Transit's expert witnesses on October 14, 2020, requesting the experts' "entire file" as to the case. Sound Transit moved the court to quash those subpoenas. The owners contended that Sound Transit had failed to supplement relevant discovery throughout 2020. The court quashed the subpoenas and deferred ruling on McKee's disclosure requirements until hearing motions in limine. At those hearings, counsel for Sound Transit represented having already turned over some of McKee's supplemental discovery to the owners, with plans to further supplement. Counsel for the owners later confirmed receipt of these files. More briefing was then devoted to the issue, with the owners again asserting that Sound Transit, in contravention of its duty to supplement, had not turned over certain materials. McKee was deposed.

The court, considering this history, concluded that application of the Burnet factors did not support exclusion. It found that willfulness was demonstrated by nothing more than Sound Transit's failure to supplement and that to hold a discovery violation alone sufficient to demonstrate willfulness would render meaningless that prong of Burnet. It noted that any prejudice to the owners was caused primarily by their own decision not to depose McKee after he had been redisclosed. And it concluded that lesser sanctions, such as a short

19

continuance or further discovery—as had occurred—sufficed to address the issue.

The trial court acted within its discretion in so ruling. Its analysis of the factors' application was thorough, informed, and accurate. In particular, the availability of lesser sanctions, many of which had functionally been provided to the owners in the form of supplemental discovery, supports the court's analysis. We find no error.

### Larger Parcel

The owners assign error to the court's rulings "forbidding any evidence by the Owners based on noise emanating from the Sound Transit property." Here, they seem to be assigning error to the trial court's ruling that "[e]vidence and testimony of claimed impacts on [the owners]' Properties that flow from the impact of the Project on the general neighborhood is excluded. . . . The single parcel analysis does not apply as there is no unity of ownership and [the owners] are also recovering temporary damages."[9] We find no error in this ruling.

---

[9] The owners cite to the page of the order on the motions in limine in which this language appears in the section of their brief titled "The court erred by not treating the Project as a whole." They say "[t]he court held that the Owners could not claim the noise emanating from Sound Transit property not subject to the Restrictions as part of their claim for just compensation." They continue: "[t]he Owners contended that the joinder of those lots with lots subject to the Restrictions were part of a larger parcel owned by ST. . . . Thus, the contended the Owners [sic], the noise emanating from them was appropriately considered by the jury." Their brief then conducts the larger parcel analysis addressed in this section of our opinion.

The owners' Assignment of Error 3b argues the trial court erred "[b]y forbidding any evidence by the Owners based on noise emanating from the Sound Transit property." Their corresponding "Issue Presented for Review" asks "[w]hether the trial court erred by forbidding the Owners from including a claim for just compensation based on construction on, and noise emanating from, the

The "larger parcel" theory, which the owners briefed below,[10] dictates that where "the State condemns one portion of a larger parcel of property and the effect is to reduce the value of the larger parcel, the owner may recover for damage for the reduction in value of the larger parcel." State v. Wandermere Co., 89 Wn. App. 369, 377, 949 P.2d 392 (1997). In determining whether a larger parcel exists, the courts consider three elements: (1) unity of ownership, (2) unity of use, (3) and contiguity. Doolittle v. City of Everett, 114 Wn.2d 88, 95, 786 P.2d 253 (1990).

As the trial court correctly concluded, this is not a larger parcel case. The owners attempt to impose the larger parcel test, which applies to the property being condemned, on Sound Transit's ownership of multiple properties within the Surrey Downs neighborhood. But whether Sound Transit's properties meet the larger parcel test is not relevant; Sound Transit's land is not being condemned. We find no error.

Trial Management Decisions

The owners contest two of the trial court's trial management decisions: limiting testimony of the owners as to their properties' value to 12 minutes, and "forcing the Owners to present their expert witnesses first." Because the trial

Sound Transit property." This assignment and issue do not explicitly concern the larger parcel analysis, though the related section of appellants' brief appears to do so. If they were intended to address a theory other than the larger parcel analysis, that theory does not receive briefing from the appellants and we need not, and will not, review it. See State v. Elliott, 114 Wn.2d 6, 15, 785 P.2d 440 (1990) ("This court will not consider claims insufficiently argued by the parties.").

[10] They argued that Sound Transit's combined ownership of various parcels met this test.

court was acting within its discretion when it scheduled the presentation of testimony and imposed time limits based on unpredicted trial delays caused in part by the owners themselves, we find no error.

Given that it is in the "best position to perceive and structure its own proceedings . . . a trial court has broad discretion to make a variety of trial management decisions." State v. Dye, 178 Wn.2d 541, 547, 309 P.3d 1192 (2013). Trial management decisions of this sort include controlling the "mode and order of interrogating witnesses" to, among other reasons, "avoid needless consumption of time." ER 611(a). Because of the trial court's close knowledge of the facts underlying its trial management decisions, we review them for abuse of discretion. Dye, 178 Wn.2d at 548.

Both of these contested trial management decisions occurred in the context of unexpected trial delays and limited juror availability. Counsel for the owners initially estimated needing six or seven days for their case in chief. Sound Transit estimated needing four days for its case. At the time these estimates were made, the court noted that it would report them to jurors and "then you're stuck with that. I will end the case on that day." It correspondingly set a final trial day of December 7, 2020.

But trial did not proceed as planned. After beginning on November 17, 2020, Sound Transit rested its case on November 24, 2020, after around four full days of testimony. The owners began their case in chief that same day and continued through another four trial days, to December 2. Trial progress was, however, slow, in part because of late disclosures from the owners regarding

new exhibits, witnesses, and testimony they wished to proffer in response to McKee's valuation testimony. These new disclosures raised the possibility that the owners themselves might be seeking to testify beyond the scope permitted by the court's rulings. Facing strict scheduling limitations, the court offered that trial could either finish on December 7, as previously anticipated, or be continued into January pending confirmation of jurors' availability. Regardless, the court made clear that it was contemplating limitations on the length of testimony. Counsel for the owners anticipated needing another four to seven days of trial.

Having heard from the parties, the trial court concluded that it would not be possible to end trial by December 7. It ordered supplemental disclosures be made regarding what evidence the owners would seek to admit through their testimony. It ordered that expert witnesses, already disclosed to Sound Transit, be heard first and that the property owner witnesses be heard once trial reconvened in January. Finally—having conferred with jurors to determine their availability—the court found more trial time on January 4 through January 6 of 2021 and correspondingly ordered no more than 12 minutes per owner's testimony.

The trial court did not abuse its discretion when imposing time limits and ordering the presentation of testimony. It had concerns about juror availability, holiday-related scheduling limitations, and the everyday exigencies of the courthouse. In the face of those concerns—which potentially threatened mistrial—the court exercised its discretion to use the time available in the most efficient manner possible. Ordering the experts to testify first ensured time for

23

disclosure regarding the owners' lay valuation testimony. And limitations on the length of valuation testimony were required by the small amount of available trial time.

The owners aver that the court's rulings were due process violations justifying reversal. We disagree. Of the two Washington cases they cite in this context, only Baxter v. Jones speaks directly on the issue, saying: "the court's premature termination of cross examination based on a predetermined time to complete the trial was error." 34 Wn. App. 1, 4, 658 P.2d 1274 (1983). But time limits, particularly when known in advance, do not equate to the unexpected denial of the ability to cross examine seen in Baxter, where the court suddenly ended a cross examination that had "just begun." 34 Wn. App. at 3. Baxter acknowledges the discretionary power of the court while denying that it confers the ability to wholly deny a litigant of the ability to cross examine. 34 Wn. App. at 3-4. No such denial of a constitutional magnitude occurred here.

These decisions fell squarely within the court's power to manage trial. We find no error.

### Valuation Testimony of the Owners

The owners assign error to the court's exclusion of testimony from the owners about the value of their properties based on non-personal knowledge or a proper formula for computing value. We conclude that the trial court acted within its discretion in excluding this testimony, which is more appropriately the domain of experts.

Case law permits owners of property to testify regarding its value. Equitable Capital, 127 Wn.2d at 211. This is because " 'one who has owned property is presumed to be sufficiently acquainted with its value and the value of surrounding lands to give an intelligent estimate of the value of [their] property.' " Equitable Capital, 127 Wn.2d at 211 (quoting State v. Wilson, 6 Wn. App. 443, 451, 493 P.2d 1252 (1972)). There are, however, limits to this testimony's scope: "In giving [their] opinion the owner is entitled to explain [their] valuation by relevant and competent methods of ascertaining value." Equitable Capital, 127 Wn.2d at 211 (quoting Wilson, 6 Wn. App. at 451). The court in Equitable Capital excluded testimony where that formula consisted merely of a multiplication of the square feet of property at issue with an unsupported assertion that its value was $12 per square foot. 127 Wn.2d at 212-13. Evidentiary errors are reviewed for abuse of discretion. State v. Castellanos, 132 Wn.2d 94, 97, 935 P.2d 1353 (1997).

The owners assign error specifically to the trial court's rulings in its motions in limine. The trial court granted Sound Transit's motion in limine prohibiting the owners from expressing opinions about the value of their property "that is not based on [their] personal knowledge or on a proper formula for computing value." The court specifically excluded references to the property valuation companies Zillow and Redfin's price estimates. Its order did not specifically exclude introduction of information from the Recorder's Office or the Assessor's office.

25

The court did not abuse its discretion in making these rulings. We turn first to the owners' assertion that the court forbade owners from "testifying on the value of their properties based on properties they were personally familiar with." The court's rulings on motions in limine did no such thing. Instead, it excluded testimony not (1) based on the owners' personal knowledge or (2) on a proper formula for computing value. The owners do not point to a specific moment in trial to the contrary. We find no error, and will not consider this issue further. See Palmer, 81 Wn. App. at 153 ("Passing treatment of an issue . . . is insufficient to merit judicial consideration.").

Second, we consider the owners' assertion that the court forbade them from testifying as to the value of properties based on "public records." The court's orders on the motions in limine again do not speak to this issue. The owners do not point to any specific evidentiary argument or ruling at trial relevant to this assignment of error. We find no error. See Mills v. Park, 67 Wn.2d 717, 721, 409 P.2d 646 (1966) ("We are not required to search the record for applicable portions thereof in support of the plaintiffs' arguments.").

Third, we consider the owners' assertion that the court forbade owners from testifying as to the value of properties based on "public compilations." This assertion speaks directly to the use at trial of valuations created by Zillow, Redfin, or similar services. As made clear in Equitable Capital, though property owners may submit valuation evidence based on certain formulae, any formula used must be "competent." 127 Wn.2d at 211. The court in Equitable Capital therefore required that the formula used be explained and justified to the court for

analysis as to its appropriateness. 127 Wn.2d at 212-13. Here, the court did not abuse its discretion in excluding valuation testimony based on formulas not available to the court for evaluation as to their competency, as is the case with Zillow or Redfin.

The owners' reliance on State v. Shaw, 120 Wn. App. 847, 849, 86 P.3d 823 (2004), to rebut this ruling is misplaced. Shaw concluded the trial court had not abused its discretion when it admitted Kelley Blue Book valuations of vehicles under ER 803(a)(17)'s hearsay exception.[11] 120 Wn. App. at 849. There, the relevant testimony was introduced through a detective testifying as to his regular use of the Kelley Blue Book. Shaw, 120 Wn. App. at 848-49. Here, it was introduced outside the context of expert testimony,[12] without explanation of the relevant formula. And moreover, it occurred not related to car prices but housing prices, which vary widely by region. Shaw is inapposite.

We find no error in the court's limits on the owners' valuation testimony.

Trial Court's "Ridiculous" Comment

The owners next challenge a comment made by the trial court during the examination of Mark Hamlon, a property owner: "This is ridiculous." They contend the comment was a due process violation and improper judicial

---

[11] Which applies to "[m]arket quotations, tabulations, lists, directories, or other published compilations generally used and relied upon by the public or by persons in particular occupations."

[12] ER 602 requires witnesses to have personal knowledge on the matters they testify to, unless they are an expert witness. Expert witnesses can proffer opinion testimony based on "scientific, technical, or other specialized knowledge" where they are qualified as an expert in that field. ER 702.

comment on the evidence.  We agree that the comment was inappropriate, but do not conclude that it constituted error.

Judicial comments on evidence are prohibited by the Washington Constitution.  State v. Levy, 156 Wn.2d 709, 719, 132 P.3d 1076 (2006); CONST. art. IV, § 16 ("Judges shall not charge juries with respect to matters of fact, nor comment thereon, but shall declare the law.").  Where a judicial comment was not objected to during trial, and so not preserved for appeal, it is still reviewable as manifest error.  Levy, 156 Wn.2d at 719-20; RAP 2.5(a).  Manifest error is established where prejudice is shown by the appealing party.  State v. Kirkman, 159 Wn.2d 918, 926-27, 155 P.3d 125 (2007).

Here, Hanlon's testimony provoked a number of sustained objections.  First, when asked what his understanding of "just compensation" was, he began "I took information from three houses that had recently sold . . . ."  This question was ruled inadmissible because it sought to introduce unqualified expert testimony on appraisal, contravening the court's rulings regarding lay and expert testimony made during motions in limine.  In response to subsequent questioning, Hanson continued attempting to introduce comparative valuation testimony and provoked two more sustained objections.  Then the following exchange occurred:

A:    The other matter I was going to share with everyone here is Bates McKee's corrections, which I believe is Exhibit 190. There were properties in there that he used and he didn't appraise them.  Am I allowed to use that?

Q [by owners' counsel Dore]:  It's in evidence, go ahead.

THE COURT: No, you're not allowed.

28

MR. DORE: That's with -- okay, if you're not --

THE COURT: Mr. Dore, you're not giving your witnesses instructions on the law of the case as I have ruled upon it.

MR. DORE: Okay.

THE COURT: This is ridiculous. This is taking away from his time. Ask a question.

No objection followed either immediately or outside the presence of the jury.

The court's expression of exasperation was inconsistent with appropriate judicial demeanor. But we decline to conclude that its comment constituted a statement on the evidence or led to any due process violation requiring reversal. The context demonstrates that it was not a comment on the evidence but instead addressed the failure of the owners' attorney to prevent his witness from giving improper testimony after multiple sustained objections and clear evidentiary rulings. Even if it were construed as comment on evidence, however, it was not only unlikely to be prejudicial, but the owners do not even attempt to demonstrate how prejudice accrued in their briefing. We find no error.

<u>Jury Instructions on Burden of Proof</u>

The owners challenge Jury Instruction No. 8, contending that it misstated the burden of proof borne by the owners with regard to their temporary taking claim. We disagree.

The Washington constitution prohibits its government from taking private property "without just compensation having been first made." CONST. art. I, § 16. Where private property is taken without prior compensation, the injured party may bring an inverse condemnation claim to "recover the value of property which has been appropriated in fact, but with no formal exercise of the power of

29

eminent domain." Phillips v. King County, 136 Wn.2d 946, 957, 968 P.2d 871 (1998). The party alleging inverse condemnation must establish five elements: "(1) a taking or damaging (2) of private property (3) for public use (4) without just compensation being paid (5) by a governmental entity that has not instituted formal proceedings." Phillips, 136 Wn.2d at 957. The party alleging the inverse condemnation bears the burden of proof as to damages. Keene Valley Ventures, Inc. v. City of Richland, 174 Wn. App. 219, 226, 298 P.3d 121 (2013).[13]

Jury instructions receive de novo review. State v. Johnson, 180 Wn.2d 295, 300, 325 P.3d 135 (2014).

Here, Jury Instruction No. 8 reads, in relevant part: "Each [owner] bears the burden of proving by a preponderance of the evidence any claim for temporary impact and diminution in fair market value to their property." The owners' temporary taking claim was premised on the notion that Sound Transit committed a taking through its construction activities prior to the amendment of

---

[13] This burden stands distinct from the burden in a normal condemnation action, filed by the government *before* a taking has occurred. Under such circumstances, although the State as moving party would normally bear a burden of proof, "it follows as a practical matter that if the property owner wants more than the condemner's evidence indicates the fair market value to be, [they] will have to introduce some evidence of value more convincing to the minds of the jury than that offered by the condemner." State v. Amunsis, 61 Wn.2d 160, 162, 377 P.2d 462 (1963). The court in Amunsis therefore concluded:

> there should hereafter be no suggestion that either the property owner or the condemner, in such a case, has to prove the fair market value at the time of trial of the property being condemned. After the condemner has met the burden of going forward with the evidence as to value, it is a question for the jury on the probative effect of all the evidence regardless of who offered it, and the jury should be so instructed.

61 Wn.2d at 164.

the CC&Rs. This claim was therefore an inverse condemnation claim and the jury was properly instructed that the owners bore the burden of proof on each of the elements of that claim, including damages.

The owners contend that the court's prior conclusion that Sound Transit had committed a "de facto" taking meant that it was relieved of its burden. The trial court did conclude, in its order on the owners' motion to clarify its order on summary judgment, that they had a claim of "de facto" taking in regards to Sound Transit's actions before amendment of the CC&Rs. But Keene has already spoken directly on this issue: one element of an inverse condemnation claim is proof of "diminution" of value, which involves proof of damages. 174 Wn. App. at 226.

We find no error. Jury Instruction No. 8 did not misstate the law.

Attorney Fees

Finally, the owners request attorney fees on appeal, arguing that Sound Transit abandoned its action by filing its voluntary dismissal, and so counsel are entitled to fees under RCW 8.25.075(1)(b). We disagree and do not award fees.

RCW 8.25.075(1)(b) is the provision providing attorney fees to respondents in eminent domain actions where the state has abandoned the proceeding; this is the provision the owners relied upon when requesting fees after the case's voluntary dismissal. But what constitutes abandonment was addressed by our Supreme Court in 2016. Cent. Puget Sound Reg'l Transit Auth. v. Airport Inv. Co., 186 Wn.2d 336, 348, 376 P.3d 372 (2016). The court

31

rejected an argument that Sound Transit had abandoned a proceeding by altering the scope of its condemnation, saying:

> The very fact that the parties litigated to judgment over just compensation establishes that the proceeding was never abandoned. AIC advocates for a rule that would consider a condemnation proceeding to be abandoned whenever the taking "materially changes." But such a rule is contrary to established precedent holding that *a proceeding is abandoned when the condemnor never takes any property*.

Airport Inv. Co., 186 Wn.2d at 348-49 (emphasis added).

The scope of the taking argument changed over the course of trial in this case as well—Sound Transit acquired the rights it needed outside the litigation process, and trial went forward on what were functionally inverse condemnation counterclaims. But that a judgment was ultimately reached establishes the lack of abandonment of the action as a whole. Whether Sound Transit's voluntary dismissal constituted abandonment is moot; any abandonment that may have occurred was reversed by the dismissal's vacation. We therefore deny the request for attorney fees on appeal.

We affirm.

Smith, A.C.J.

WE CONCUR:

Colun, J.          Andrus, C.J.

32

APPENDIX

LIST OF ALL DEFENDANTS

LEONARD S. & KARI C. MARINO (EL169 & EL806), individually and the marital community composed thereof; FREDERICK C. WALKLEY, JR. and "JANE/JOHN DOE" WALKLEY (EL175 & EL645) individually and the marital community composed thereof; FB R/E 9, LLC (EL179), a Washington limited liability company; KAREN HARRISON (EL182), a married woman as her separate estate; KAREN ELSE BAITIS & ANTHONY WELCHER (EL183), individually and the marital community composed thereof; WARITTHA FUANGAROM & PORANIK RUNGRUENGWATANACHAI (EL186), individually and the marital community composed thereof and SAKETOUCH FUANGAROM & JITRATA ROME RATTANAPHOL (EL186), individually and the marital community composed thereof; LEI TIAN & FANG QI (EL190), individually and the marital community composed thereof; WEI LIU & LI QIAN (EL194), individually and the marital community composed thereof; PAMELA UNGER, who acquired title as PAMELA R. DAVIS & NATHAN W. UNGER (EL195), individually and the marital community composed thereof; CANYON CREEK CROSSING, LLC (EL196), a Washington limited liability company; 11005 MAIN STREET LLC (EL213), a Washington limited liability company; FIONA WESTBY and "JANE/JOHN DOE" WESTBY (EL604 & EL607) individually and the marital community composed thereof; ROGER A. & YE Z. WOLCOTT (EL606), individually and the marital community composed thereof; KATHLEEN T. HODGE and "JOHN/JANE DOE" HODGE (EL608) individually and the marital community composed thereof; DAVID D. PAISLEY & WENDY H. PAISLEY (EL608 & EL764), individually and the marital community composed thereof; FRANCIS M. HOGLE, IV and "JANE/JOHN DOE" HOGLE (EL609) individually and the marital community composed thereof; ROBERT F. WILSON & SUE R. WILSON, TRUSTEES, AND THE SUCCESSOR TRUSTEES OF THE WILSON LIVING TRUST (EL610); JIM & ELOISA E. TRAN (EL61I), individually and the marital community composed thereof; ROBERT W. & MARJORIE MCMAINS (EL614), individually and the marital community composed thereof; YUANYUAN HAO, individually, and YUANYUAN HAO, as custodian for ERICA HAO (EL615); ZAHRA T. KASHANI and "JANE/JOHN DOE" KASHANI (EL6I7) individually and the marital community composed thereof; LEE & SUSAN WANG (EL619), individually and the marital community composed thereof; STEPHEN & SIHEM SCHIRRECKER (EL620), individually and the marital community composed thereof; QING ZHONG and "JANE/JOHN DOE" ZHONG (EL621) individually and the marital community composed thereof; YIXIONG WANG & MIN W. YU (EL623), individually and the marital community composed thereof; CARL JOHN GRIFFIN and "JANE/JOHN DOE" GRIFFIN (EL624) individually and the marital community composed thereof; WILLIAM L. & CHUI YIN LEUNG HUBBARD (EL625), individually and the marital community composed thereof; MICHAEL E. MONK & ANGELA L. PEIXOTTO-MONK (EL626), individually and the marital community composed thereof; HIROKI & AKANE ITOH (EL627), individually and the marital community

composed thereof; YAN SUN & XIU YING ZHANG (EL628), individually and the marital community composed thereof; ERIK M. FROMM and "JANE/JOHN DOE" FROMM (EL629) individually and the marital community composed thereof; JESS D. & SHARON L. PETERSON (EL630), individually and the marital community composed thereof; XUAN C. KOU & PING LU (EL632), individually and the marital community composed thereof; SETSUKO KIDA and "JANE/JOHN DOE" KIDA (EL633) individually and the marital community composed thereof; STEVEN & LORI RINN (EL635), individually and the marital community composed thereof; YUAN GAO & JIANJUN ZHANG (EL636), individually and the marital community composed thereof; JAMES COUGHLIN & DIANE COUGHLIN, TRUSTEES OF THE REVOCABLE TRUST OF JAMES COUGHLIN AND DIANE COUGHLIN (EL637); JOYCE ITO (EL639); TIMOTHY & CARRIE HOOD (EL640), individually and the marital community composed thereof; A. Y. KURATA and "JANE/JOHN DOE" KURATA (EL643) individually and the marital community composed thereof; DMITRIY & VALENTINA KISELEV (EL644), individually and the marital community composed thereof; MATTHEW & MICHELLE BOMBERGER (EL646), individually and the marital community composed thereof; MONTE D. BLOOM and "JANE/JOHN DOE" BLOOM (EL647) individually and the marital community composed thereof; SHELLY ANN DOCHTERMANN and "JANE/JOHN DOE" DOCHTERMANN (EL649) individually and the marital community composed thereof; CHURLI SU and "JANE/JOHN DOE" SU (EL650) individually and the marital community composed thereof; GLENN K. & SHERRY L. RYAN (EL65 l), individually and the marital community composed thereof; SUZANNE ALISON DRAKE and "JANE/JOHN DOE" DRAKE (EL654) individually and the marital community composed thereof; KRISTIN A. EDLUND & KEN J. ROSENOW (EL655), individually and the marital community composed thereof; CELESTE W. WALSEN, TRUSTEE, THE WALSEN CREDIT TRUST (EL656); MICHAEL D. & HALINA M. MCMASTER (EL662), individually and the marital community composed thereof; DOUGLAS Y. HANDA & JOYCE M. HANDA, TRUSTEES FOR THE HANDA FAMILY 1996 LIVING TRUST (EL663); DAVID A. MILOT and "JANE/JOHN DOE" MILOT (EL664) individually and the marital community composed thereof; REBECCA Y. DENG & ZHI-CHI T. LIN (EL665), individually and the marital community composed thereof; RAYMOND E. BLOCK and "JANE/JOHN DOE" BLOCK (EL668) individually and the marital community composed thereof; CAROLYN G. DENNING and "JANE/JOHN DOE" DENNING (EL669) individually and the marital community composed thereof; N. SCOTT & ELLEN K. LAMPE (EL671), individually and the marital community composed thereof; FRANK V. WESTERLUND & FERESHTEH DEHKORDI WESTERLUND, HUSBAND AND WIFE AS TO AN UNDIVIDED 50% INTEREST AND MARYAM HOSSEINI DEHKORDI & SEYED-RAHIM HOSSEINI-DEHKORDI, TRUSTEES OF THE 1999 REVOCABLE TRUST OF MARYAM HOSSEINI-DEHKORDI U/A/D 8/9/99, AS TO AN UNDIVIDED 50% INTEREST (EL672); SANDRA L. LEACH and "JANE/JOHN DOE" LEACH (EL673) individually and the marital community composed thereof; BRADFORD C. DAVIS and "JANE/JOHN DOE" DAVIS (EL676) individually and the marital community composed thereof; JOHN A. & JANINE W. ROSE

(EL677), individually and the marital community composed thereof; DAVID SLIGHT & CLARE M. SHEEHAN (EL678), individually and the marital community composed thereof; HANK SHUEN SHYANG LO & TAI DI FANG (EL680), individually and the marital community composed thereof; DAVID C. KU & AN-CHIN CHEN (EL681), individually and the marital community composed thereof; DANDAN HE & CHUJIANG XIAO (EL683), individually and the marital community composed thereof; BRADLEY A. & LAUREN K. PADDEN (EL684), individually and the marital community composed thereof; ANDREW PARDOE & ALBERTA FAULK (EL685), individually and the marital community composed thereof; PHILLIP LAWRENCE MARTINEZ (EL686); RICHARD J. & JENNIFER STROPHY (EL688), individually and the marital community composed thereof; RYAN A. & KIMBERLEY B. ASLAKSON (EL689), individually and the marital community composed thereof; RUSTY DESCHENES & HONG GAO (EL691), individually and the marital community composed thereof; ERIC J. & ANN G. ROHLMAN (EL693), individually and the marital community composed thereof; ROMAN HOLENSTEIN & QING CHANG (EL694), individually and the marital community composed thereof; SCOTT P. VOLLMOELLER and "JANE/JOHN DOE" VOLLMOELLER (EL695) individually and the marital community composed thereof; LIN XIAO & XIAOHUA CHEN (EL697), individually and the marital community composed thereof; CHUN MING CHANG & YU CHEN WANG (EL699 & EL794), individually and the marital community composed thereof; YOON JIK & HYE SOOK KIM (EL701), individually and the marital community composed thereof; JASON Y. ZIEN & FONG CHING LEE (EL702), individually and the marital community composed thereof; REGAN W. & REBECCA C. SIDIE (EL703), individually and the marital community composed thereof; SIONE HOFAKA & JEAN NGAN MALAMALA (EL705), individually and the marital community composed thereof; NICOLE C. MILLER and "JANE/JOHN DOE" MILLER (EL706) individually and the marital community composed thereof; EDWARD J. & PHYLLIS K. HAHN (EL709), individually and the marital community composed thereof; DANA C. HELM and "JANE/JOHN DOE" HELM (EL710) individually and the marital community composed thereof; PIN HSIAO & ANTONINA Y GORDEEVA (EL733), individually and the marital community composed thereof; MICHAEL R. PALMER and "JANE/JOHN DOE" PALMER (EL736) individually and the marital community composed thereof; KEITH ZHANG & CINDY X. LU (EL 738), individually and the marital community composed thereof; PENG LI AND HUI SUN (EL752), individually and the marital community composed thereof; CLAIRE WALTMAN and "JANE/JOHN DOE" WALTMAN (EL757) individually and the marital community composed thereof; SUSAN R. MARGLIN, OR HER SUCCESSORS IN TRUST, UNDER THE SUSAN R. PAYA MARGLIN TRUST DATED SEPTEMBER 2, 2009 (EL758); TIMOTHY & ABIGAIL HORSFALL (EL759), individually and the marital community composed thereof; RICHARD S. APPLESTONE and "JANE/JOHN DOE" APPLESTONE (EL760) individually and the marital community composed thereof; ZHIHAI LIANG & WANKUN LUO (EL761), individually and the marital community composed thereof; FB R/E 10, LLC (EL 762), a Washington limited liability company; RICHARD C. & CHERYL A. LO (EL765), individually and the

marital community composed thereof; CHARLIE CAI, individually, and QING CAI & ANNA CAI (EL766), individually and the marital community composed thereof; MARY E. HOOLE and "JANE/JOHN DOE" HOOLE (EL767) individually and the marital community composed thereof; SAWAKO S. HACKER and "JANE/JOHN DOE" HACKER (EL769) individually and the marital community composed thereof; SHENGLIU DAI & CHUNWEI GUO (EL770), individually and the marital community composed thereof; NANCY ALLEN CONQUIST and "JANE/JOHN DOE" CONQUIST (EL771) individually and the marital community composed thereof; WILLIAM G. & JERI D. BOETTCHER (EL773), individually and the marital community composed thereof; ANN C. GUILFORD and "JANE/JOHN DOE" GUILFORD (EL774) individually and the marital community composed thereof; GRETCHEN H. DAVIS & JOHN E. KING (EL775), individually and the marital community composed thereof; GAYLE T. MCELROY and "JANE/JOHN DOE" MCELROY (EL777) individually and the marital community composed thereof; EILEEN A. MCCARTY and "JANE/JOHN DOE" MCCARTY (EL779) individually and the marital community composed thereof; MATTHEW FRANCIS & LANA LAUREL HANSEN (EL782), individually and the marital community composed thereof; SHINJI & KATRIN GOTO (EL783), individually and the marital community composed thereof; TROY & MARIAN TERRY (EL784), individually and the marital community composed thereof; L. A. GOODRICH and "JANE/JOHN DOE" GOODRICH (EL785) individually and the marital community composed thereof; DEBORAH A. LELINSKI and "JANE/JOHN DOE" LELINSKI (EL786) individually and the marital community composed thereof; JONATHAN SHULTZ and "JANE/JOHN DOE" SHULTZ (EL788) individually and the marital community composed thereof; JOHN & NIAN MUNTRIM (EL792), individually and the marital community composed thereof; EMMA HSUN CHANG and "JANE/JOHN DOE" CHANG (EL793) individually and the marital community composed thereof; MARILYN L. CHISHOLM and "JANE/JOHN DOE" CHISHOLM (EL795) individually and the marital community composed thereof; RON N. & PEGGY A. JOHNSON (EL796), individually and the marital community composed thereof; NATHAN W. & LILY S. BINGHAM (EL797), individually and the marital community composed thereof; HA YOUNG & HWA SOOK LEE (EL798), individually and the marital community composed thereof; DANIEL M. & LIZA A. HEVERLY (EL800), individually and the marital community composed thereof; THOMAS L. ZINSER JR. and "JANE/JOHN DOE" ZINSER (EL801) individually and the marital community composed thereof; KEVIN Z. GREY & JESSI E. ALVA (EL802), individually and the marital community composed thereof; STEPHEN M. & JOHNIE Y. HALL (EL803), individually and the marital community composed thereof; EVELYN QUARNSTROM and "JANE/JOHN DOE" QUARNSTROM (EL804) individually and the marital community composed thereof; DAVID J. & ING-MEI DECKER (EL805), individually and the marital community composed thereof; VADIM ZMANOVSKIY & TATIANA ZMANOVSKAYA (EL807), individually and the marital community composed thereof; CATHERINE M. NIELSEN-ELLIOTT AND ELDEN E. ELLIOTT (EL809), individually and the marital community composed thereof; SERGEI & NATALIA ANTONOV (EL810), individually and the marital community composed thereof;

HEDY BARRAT and "JANE/JOHN DOE" BARRAT (EL811) individually and the marital community composed thereof; MANUEL H. LUI & SUSAN S. CHAN (EL812), individually and the marital community composed thereof; WENDY J. TAYLOR, who acquired title as WENDY J. WHITAKER & GARY J. TAYLOR (EL814), individually and the marital community composed thereof; ILANA R. SMITH and "JANE/JOHN DOE" SMITH (EL816) individually and the marital community composed thereof; 901 110TH AVE SE, LLC, a Washington limited liability company (EL817); NANCY E. HUENEFELD and "JANE/JOHN DOE" HUENEFELD (EL818) individually and the marital community composed thereof; TRACEY FERRISS and "JANE/JOHN DOE" FERRISS (EL851) individually and the marital community composed thereof; HEIKKI & EVA MANNISTO (EL853), individually and the marital community composed thereof; CHARLES H. FISHER and "JANE/JOHN DOE" FISHER (EL854) individually and the marital community composed thereof; MARK K. MULLER & ELIZABETH SIEVERT MULLER (EL855 & EL864), individually and the mmital community composed thereof; MA SANGSTER and "JANE/JOHN DOE" SANGSTER (EL856) individually and the marital community composed thereof; RONGRONG LI & NENGNENG QIU (EL857), individually and the marital community composed thereof; LAN & CARY TENZER (EL858), individually and the marital community composed thereof; PAULINE O'HARE and "JANE/JOHN DOE" O'HARE (EL859) individually and the marital community composed thereof; SNC DEVELOPMENT, LIMITED LIABILITY COMPANY, a Washington limited liability company (EL860); ELIAS G. & BARBARA J. COURY (EL861), individually and the marital community composed thereof; BELLEVUE 9716 LLC, a Washington limited liability company (EL862); BEI ZHANG & HUAN YU (EL863), individually and the marital community composed thereof; DONGLOK KIM & EUNJOO JEONG (EL865), individually and the marital community composed thereof; ROSSEN ATANASSOV & SEVDA TOPALOVA (EL866), individually and the marital community composed thereof; YOUNG HO & ME SUN KWON (EL867), individually and the marital community composed thereof; ISAAC & AMY CATHLEEN ALSHIHABI (EL868), individually and the marital community composed thereof; VIKTOR I. & YELENA P. DOROSH (EL869), individually and the marital community composed thereof; JON D. ANDERSON & STACIE M. LEBLANC (EL870), individually and the marital community composed thereof; AMEET CHITRE & GAURI SWAR (EL872), individually and the marital community composed thereof; NICOLE VAIVADAS and "JANE/JOHN DOE" VAIVADAS (EL873) individually and the marital community composed thereof; PATRICK D. & LINDA A. O'ROURKE (EL876), individually and the marital community composed thereof; MITCHELL & BERNICE LACEY (EL877), individually and the marital community composed thereof; C.R. CUMMINGS JR. and "JANE/JOHN DOE" CUMMINGS (EL878) individually and the marital community composed thereof; CHES K. & NINA KING (EL879), individually and the marital community composed thereof; RAJANIKORN & TERAMON ROEKSBUTR (EL880), individually and the marital community composed thereof; and SUSAN R. P. MARGLIN and "JANE/JOHN DOE" MARGLIN (EL883) individually and the marital community composed thereof.